RECEIVED
FEB - 7 2022
U.S.C.A. 3rd. CIR

# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

---

## No. 22-_____

---

## COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION

**Petitioner**

**v.**

## THOMAS E. PROCTOR HEIRS TRUST

---

## PETITION FOR PERMISSION TO APPEAL

---

PETITION FOR PERMISSION TO APPEAL FROM THE ORDER CERTIFIED FOR INTERLOCUTORY APPEAL BY THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA ENTERED DECEMBER 3, 2021

JOSH SHAPIRO
*Attorney General*

Office of Attorney General
15th Floor, Strawberry Square     BY:     MICHAEL J. SCARINCI
Harrisburg, PA 17120                              *Deputy Attorney General*
Phone: (717) 857-2184
FAX:   (717) 772-4526                      J. BART DELONE
                                                            *Chief Deputy Attorney General*
DATE: February 4, 2022                      *Appellate Litigation Section*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

STATEMENT OF JURISDICTION ................................................... 1

INTRODUCTION ............................................................................... 2

QUESTIONS PRESENTED................................................................ 5

STATEMENT OF THE FACTS......................................................... 6

Legal and Historical Background..................................................... 6

Chain of Title and Assessment........................................................ 10

Proceedings in the District Court .................................................... 13

RELIEF SOUGHT............................................................................. 15

REASONS WHY THE APPEAL SHOULD BE ALLOWED ............ 16

1.    The certified order involves controlling questions of law........... 16

2.    There is not only substantial ground for difference of opinion on these
      questions, the district court's determination is contrary to settled
      Pennsylvania law................................................................... 21

3.    An immediate appeal would materially advance the ultimate
      termination of the litigation.................................................. 23

CONCLUSION .................................................................................. 25

CERTIFICATE OF COUNSEL........................................................... 26

CERTIFICATE OF SERVICE ............................................................ 27

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ahrenholz v. Board of Trustees of Univ. of Ill.*, 219 F.3d 674 (7th Cir. 2000).21, 23

*Bannard v. N.Y. State Natural Gas Corp.*, 293 A.2d 41 (Pa. 1972)............. 6, 9, 19

*Barbato v. Greystone Alliance, LLC*, 916 F.3d 260 (3d Cir. 2019)...................... 17

*Bartnicki v. Vopper*, 200 F.3d 109 (3d Cir. 1999) ............................................... 21

*Cornwall Mountain Investments, L.P. v. Thomas E. Proctor Heirs Trust*, 158 A.3d 148 (Pa. Super. 2017).........................................................................9, 19, 22

*F.H. Rockwell & Co. v. Warren Cty.*, 77 A. 665 (Pa. 1910).................................. 7

*Herder Spring Hunting Club v. Keller*, 143 A.3d 358 (Pa. 2016)................. passim

*Katz v. Carte Blanche Corp.*, 496 F.2d 747 (3d Cir. 1974)................16, 20, 23, 24

*Keta Gas & Oil Co. v. Proctor*, Docket No. 1975 MDA 2018, 2019 WL 6652174 (Pa. Super. 2019).........................................................................................9, 19

*McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251 (11th Cir. 2004)..................... 23

*Moore v. Dep't of Envt'l Resources*, 566 A.2d 905 (Pa. Cmwlth. 1989)..... 8, 17, 18

*Neill v. Lacy*, 1 A. 325 (Pa. 1885) ........................................................................ 18

*Pa. Game Commission v. Thomas E. Proctor Heirs Trust*, Docket No. 493 M.D. 2017 (Pa. Cmwlth, Jan. 26, 2021) ........................................................... passim

*Powell v. Lantzy*, 34 A. 450 (Pa. 1896) ............................................................9, 19

*Proctor v. Sagamore Big Game Club*, 166 F. Supp. 465 (W.D. Pa. 1958)....8, 9, 18

ii

*Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681 (9th Cir. 2011).................. 21

*Strauch v. Shoemaker*, 1 Watts & Serg. 166 (Pa. 1841)............................ 11, 18, 19

*Woodhouse Hunting Corp., Inc. v. Hoyt*, 183 A.3d 453 (Pa. Super. 2018)........... 20

*Yahama Motor Corp. v. Calhoun*, 516 U.S. 199 (1996)...................................... 17

**Statutes**

28 U.S.C § 1292 ....................................................................... passim

72 P.S. § 5020-409................................................................................... 7

Act of March 28, 1806, P.L. 644............................................................... 7

**Other Authorities**

16 Fed. Prac. & Proc. Juris. § 3929 ................................................... 16, 24

16 Fed. Prac. & Proc. Juris. § 3930 ................................................... 20, 23

Lester L. Greevy, Jr. & John A. Shoemaker, *Shale Gas Ownership-Tax Sale Titles: An Historical Perspective of the Pennsylvania Title Wash*, 85 Pa. Bar Quarterly 106 (July 2014) .............................................................. 6, 9, 10, 11

## STATEMENT OF JURISDICTION

This is a quiet title action over which the district court exercised diversity jurisdiction. *See* 28 U.S.C § 1332. This Court has jurisdiction over this petition for permission to appeal pursuant to 28 U.S.C § 1292(b). The district court certified its December 3, 2021 Opinion and Order for interlocutory appeal on January 28, 2022, making this petition, filed within 10 days of that date, timely. *See* 28 U.S.C § 1292(b).

## INTRODUCTION

The district court certified for appeal to this Court a pure question of law involving title to the subsurface rights of a tract of land that was sold at a tax sale in 1908. *See* 28 U.S.C § 1292(b). Although only a single tract of land, it is considered a "bellwether" for this litigation. Doc. 222 at 1 (order certified for interlocutory appeal). The district court's decision will impact "dozens of similar tracts of land," involving thousands of acres, in this litigation alone. Doc. 229 at 3 (certification order). Some of this land overlays the Marcellus Shale, an underground sedimentary rock formation that contains hundreds of trillions of cubic feet of natural gas, worth "hundreds of billions of dollars," which, because of recent technological developments, can now be extracted. Doc. 183 at 1.

In quieting title to the land's subsurface rights in the Thomas E. Proctor Heirs Trust (Trust) rather than the Pennsylvania Game Commission (Commission), the district court made several fundamental errors in its analysis and application of settled Pennsylvania law. Although title to the land had been divided in 1894 (surface and subsurface), the Trust did not report its separate interest in the subsurface to the taxing authority. And so, the taxing authority did not separately assess and tax that interest. When the land was sold at the 1908 tax sale for nonpayment of taxes, it had the effect of unifying title in the purchaser. In the parlance of the time, title was "washed." The Trust had a statutory period of two

2

years to challenge the tax sale for irregularities such as taxing it as a whole rather than separately. Since the Trust did not challenge the sale then, the Trust is barred from challenging it more than a century later.

The district court, however, incorrectly determined that the subsurface interest should have been separately assessed, and that the Trust could challenge the assessment more than a century later. Under the district court's novel rule, the purchaser at the tax sale acquired title to only the surface. This determination not only contradicts Pennsylvania law, it also creates chaos among landowners.

To the district court's credit, it recognized that these pure questions of state law were controlling and that Pennsylvania courts have rendered decisions on these questions contrary to that of the district court. Indeed, the Trust itself did not contest either of these elements necessary to certification.

Although the Trust did dispute whether an immediate appeal would materially advance the ultimate termination of this litigation, the district court rightly recognized that it would because "this litigation involves dozens of similar tracts that would each be subject to the same controlling legal question." Doc. 229 at 3 (certification order). When Pennsylvania law is properly applied, it is dispositive, obviating the need for trial on these other tracts, because, pursuant to that law, the Commission has superior title.

In this "exceptional case," *id.*, this Court should exercise its discretion to permit the Commission to appeal the certified order. Doing so will right the errors of the district court and bring to a close this long-running controversy impacting thousands of acres of Commonwealth land.

## QUESTIONS PRESENTED

*In the order certified for this Court's review, the district court ordered:*

> Judgment is ENTERED in favor of defendant Thomas E.
> Proctor Heirs Trust on the issue of subsurface ownership
> in the bellwether Josiah Haines Warrant only.

*In the certification order, the district court formulated the following question for this Court's review:*

> Under Pennsylvania law in effect at all times relevant to the instant
> quiet title dispute, did the owner of an "unseated" surface estate have
> a legal duty to pay taxes assessed on said surface estate, thereby
> preventing the owner—or the owner's agent—from acquiring better
> title to the land at a tax sale induced by the unseated owner's default?

*"Fairly included" within the certified order are the following two questions, which the Commission presents for review:*

1. Whether the owner of the surface or the separate owner of the
   subsurface had any duty at all to pay the taxes owed or whether, by
   operation of Pennsylvania law, the taxes were chargeable to the
   land itself, *i.e. in rem*?

2. Whether the Trust's failure to challenge the taxing authority's
   assessment and tax sale within two years of that sale, in 1908,
   precludes the Trust from challenging it more than a century later?

## STATEMENT OF THE FACTS

### Legal and Historical Background

"Prior to 1947, Pennsylvania's land was categorized as either seated or unseated land." *Herder Spring Hunting Club v. Keller*, 143 A.3d 358, 363 (Pa. 2016). Seated land was "developed with residential structures, had personal property upon it that could be levied upon for the tax due or was producing regular profit through cultivation, lumbering, or mining. *Id.* Unseated land, in contrast, "is best understood as 'wild' land." *Id.* (citation omitted). The difference was important for assessment and tax sale purposes. *See Bannard v. N.Y. State Natural Gas Corp.*, 293 A.2d 41, 49-50 (Pa. 1972).

If the assessor determined that the land was seated, it was the personal responsibility of the landowner to pay the taxes. *Herder*, 143 A.3d at 364; *Bannard*, 293 A.2d at 49. When, however, the land was unseated, the owner was not personally responsible; rather, taxes were assessed against the land itself. *See Herder*, 143 A.3d at 364; *Bannard*, 293 A.2d at 49. In other words, the obligation to pay taxes on unseated land was "*in rem.*" Lester L. Greevy, Jr. & John A. Shoemaker, *Shale Gas Ownership-Tax Sale Titles: An Historical Perspective of the Pennsylvania Title Wash*, 85 Pa. Bar Quarterly 106, 108 (July 2014) (hereinafter *Shale Gas Ownership*); *see also Herder*, 143 A.3d at 364 ("the land itself . . . is debtor for the public charge") (citation omitted).

6

Both seated and unseated land could be severed into separate estates; for example, surface and subsurface rights (oil, gas, minerals, etc.). *See Herder*, 143 A.3d at 364; *F.H. Rockwell & Co. v. Warren Cty.*, 77 A. 665, 666 (Pa. 1910). In fact, "hundreds of thousands of acres" across the Commonwealth were severed in this fashion. *See Shale Gas Ownership*, *supra* at 112.

In 1806, the Pennsylvania Legislature enacted a law imposing a reporting requirement on one "becoming" a holder of unseated land. Act of March 28, 1806, P.L. 644; *see Herder*, 143 A.3d at 368. It was the "duty of every holder of unseated lands to provide the County Commissioners," (*i.e.*, the taxing authority), "with a signed statement describing the tract of land and 'the name of the person or persons to whom the original title from the commonwealth passed, and the nature, number, and date of such original title.'" *Herder*, 143 A.3d at 368, quoting Act of 1806, § 1. The County Commissioners themselves had no duty to investigate unseated lands or "to search the deed books to discover whether lands had changed hands." *Id.* at 368-69. To incentivize compliance with this reporting requirement, the 1806 Act imposed a penalty of "'four times the amount of tax.'" *Id.* at 368, quoting 72 P.S. § 5020-409. As the Pennsylvania Supreme Court recently reemphasized, this penalty was for the holder's failure to report and "did not address the penalty for the failure to pay the tax." *Herder*, 143 A.3d at 368 (Pa. 2016).

7

Notwithstanding that reporting requirement, taxes remained chargeable against the land *unless* the separate interests were separately assessed and taxed. *See Herder*, 143 A.3d at 368. This was true even if the holder had reported a change in ownership, such as acquiring ownership in a subsurface estate. *Id.*, citing *Proctor v. Sagamore Big Game Club*, 166 F. Supp. 465, 475 (W.D. Pa. 1958), *aff'd* 265 F.2d 196 (3d Cir. 1959). Thus, as one Pennsylvania court recently put it, the "pertinent question" is not "whether the severance/reservation was reported at all, but only whether the assessment and taxation were on the entire estate." *Pa. Game Comm'n v. Thomas E. Proctor Heirs Trust*, Docket No. 493 M.D. 2017 (Pa. Cmwlth, Jan. 26, 2021) (Ceisler, J.) (Doc. 219-2 at 9), *vacated on other grounds*, 2021 WL 5346728 (Pa. Nov. 17, 2021).

When the property was not separately assessed and taxed, but assessed as a whole, and where, "none of the owners paid the tax, then the property would be sold as a whole to satisfy the tax." *Herder*, 143 A.3d at 375; *see also Pa. Game Comm'n*, Doc. 219-2 at 9 ("Property divided into surface and subsurface interests was still sold as a whole at a tax sale if the interests were not separately assessed"); *Moore v. Dep't of Envt'l Resources*, 566 A.2d 905, 908 (Pa. Cmwlth. 1989) (noting same), citing *Sagamore Big Game Club*, 166 F. Supp. at 475. Moreover, the law did not preclude the owner of the surface from purchasing the whole at a tax sale, which had the effect of divesting title of the subsurface. *See Powell v.*

8

*Lantzy*, 34 A. 450, 451-52 (Pa. 1896); *Sagamore Big Game Club*, 166 F. Supp. at 475; *see also Pa. Game Comm'n*, Doc. 219-2 at 9; *Shale Gas Ownership, supra*, at 109-11 (collecting authorities). Title was, thus, "washed," and the separate interests in the land were unified in the purchaser at the tax sale. *See Herder*, 143 A.3d at 366-368.

Pennsylvania law, however, did not leave landowners without a remedy. Even after the property was sold at a tax sale, the owner still had two years to redeem the property by paying the outstanding taxes plus interest. *Herder*, 143 A.3d at 366. During this time, the prior owners could also challenge any irregularities regarding the sale of the property. *Id.* at 374-75; *Keta Gas & Oil Co. v. Proctor*, Docket No. 1975 MDA 2018, 2019 WL 6652174, *6 (Pa. Super. 2019).[1] After that time, a tax sale could be voided in only a few circumstances, *i.e.* for "jurisdictional defects." *See Cornwall Mountain Investments, L.P. v. Thomas E. Proctor Heirs Trust*, 158 A.3d 148, 160-61 (Pa. Super. 2017). So long as the tax sale was statutorily authorized, conducted by the proper authorities, and held in response to unpaid taxes, the sale could not be voided. *Id.*

---

[1] For example, if the subsurface owner "disputed the County Commissioners' failure to assess [its] subsurface estate separately from the surface estate, [that owner] [c]ould have contested the assessment and tax sale within the initial two-year redemption period." *Herder*, 143 A.3d at 374; see also *Bannard*, 293 A.2d at 49 ("an assessment . . . cannot be collaterally attacked fifty years later").

With that background, the Commission sets forth the following necessary facts. *See* Fed.R.App.P. 5.

**Chain of Title and Assessment**

The subject land is approximately 407 acres, located in LeRoy Township, Bradford County, in the northeastern part of the Commonwealth. Doc. 219 at 6 (Commission's proposed findings). In 1793, the Commonwealth of Pennsylvania warranted a tract of land to Josiah Haines. Doc. 222 at 22 (certified order). A century later, Schrader Mining & Manufacturing Company conveyed the Haines Warrant (and other tracts) to Thomas E. Proctor and Jonathan Hill. *Id.* at 22-23. In 1894, Proctor and Hill, along with their wives, conveyed the surface estate of the Haines Warrant (and other tracts) to Union Tanning. *Id.* at 23.[2] That deed expressly reserved the subsurface rights to minerals, oil, gas, coal, and petroleum. *Id.* at 23. Thus, title to the Haines Warrant was split, with surface ownership in Union Tanning and subsurface ownership in Proctor, Hill, and their wives. The following year, Proctor died, leaving the Proctor Trust as his successor in interest. *Id.* It is

---

[2] In 1893, Proctor, and several other individuals, consolidated their extensive land holdings and created the U.S. Leather Company, one of the first Dow Jones companies. Union Tanning was a subsidiary of U.S. Leather. *Shale Gas Ownership*, *supra* at 111-12.

undisputed that the oil, gas, and minerals were never separately assessed. Doc 222 at 32 (certified opinion).

In 1903, Union Tanning conveyed its surface title to the Central Pennsylvania Lumber Company (CPLC). *Id.* at 24.[3] In 1907, CPLC did not pay the taxes owed on the Haines Warrant. *Id.* As a result, in 1908, the Bradford County Treasurer placed the property up for sale. *Id.* at 25.[4]

At that tax sale, Calvin H. McCauley, Jr. (McCauley), purchased the Haines Warrant. *Id.* at 25. More than two years later, after the time for statutory redemption had lapsed, McCauley quitclaimed his interest in the Haines Warrant back to CPLC. *Id.* In 1920, CPLC conveyed more than 7,000 acres, including the Haines Warrant, to the Commonwealth. Doc. 219 at 8 (Commission's proposed findings).

Graphically, the chain of title, as depicted below, is as follows:

---

[3] U.S. Leather formed CPLC. Union Tanning (and other U.S. Leather subsidiaries) conveyed their lands to CPLC. *Shale Gas Ownership, supra* at 112.

[4] Such sales were always held at the same time—the second Monday of June, in even years. *Herder*, 143 A.3d at 365; *Strauch v. Shoemaker*, 1 Watts & Serg. 166, 176 (Pa. 1841).



**Proceedings in the District Court**

A decade ago, the Commission commenced this action against the Trust seeking to quiet title. Doc. 1. The Commission claimed title to six warrants, totaling 2,481 acres, in Sullivan County. Doc. 40. The Trust claimed superior title to these lands and counterclaimed for title to tens of thousands of acres. Doc. 66.

The matter proceeded through motions to dismiss, discovery, and competing partial summary judgment motions, the latter which focused solely on the Haines Warrant. The Haines Warrant is considered the "bellwether" for many of the tracts at issue. Doc. 155 (R&R); 222 at 1. Initially the district court granted summary judgment in favor of the Commission on the Haines Warrant, Doc. 165 at 43; but, on reconsideration, it reversed itself, finding disputed issues of facts as to (1) what interest was assessed in 1907 and later sold at the tax sale in 1908, and (2) whether McCauley was acting as CPLC's agent at that sale. Doc 183 at 50.

After a one-day trial, the district court found that the Trust was the subsurface title owner of the Haines Warrant. Doc. 222, 223 (Exhibits A, B). The court did not find that Proctor reported any interest in the Haines Warrant. Rather, the court inferred from the fact that CPLC paid the assessed taxes that it reported its interest in the surface. Doc. 222 at 25. Because CPLC complied with the 1806 Act's reporting requirements, the court held that the Bradford County Commissioners "were 'otherwise directed' to assess the surface and subsurface

13

estates of the Josiah Haines warrant separately." *Id.* at 31. Then, even though the outstanding 1907 taxes were chargeable to the land itself, the district court erroneously determined that CPLC had a duty to pay them, and that it breached that duty. *Id.* at 34-35. Because of the district court's erroneous determination concerning duty, it also erroneously determined that CPLC could not then acquire better title through its agent/employee McCauley. *Id.* at 37-38, 43. Therefore, according to this flawed logic, McCauley's purchase operated as only a redemption of CPLC's surface interest, rather than as a title wash, which, as a matter of Pennsylvania law, would have unified the separate interests. *Id.* at 43-44.

The Commission moved, under 28 U.S.C. § 1292(b), to certify for interlocutory appeal to this Court the opinion and order dated December 3, 2021. Doc. 225, 226. The Trust opposed the motion, but only on the third element of the Section 1292(b) criteria. Doc. 229 at 1 n.1 (certification order; Exhibit C) (noting that "the Trust does not dispute" two of the three elements).

The district court concluded that all of the statutory criteria were satisfied. The district court found the third, "materially advance" element satisfied because "this litigation involves dozens of similar tracts that would each be subject to the same controlling legal question." *Id.* at 3. Thus, the district certified its December 3, 2021 opinion and order for this Court's consideration. *Id.*

This petition followed.

14

## RELIEF SOUGHT

The Commission requests that this Court grant the petition for permission to appeal. If permission is granted, the Commission will seek reversal of the district court's December 3, 2021 opinion and order. In that opinion and order, the district court misapplied established Pennsylvania law and found in favor of the Trust on the issue of ownership to the subsurface rights of the Haines Warrant.

### REASONS WHY THE APPEAL SHOULD BE ALLOWED

The district court may permit a party to appeal from an interlocutory order if that order (1) "involves a controlling question of law," (2) "as to which there is substantial ground for difference of opinion," and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). When the district court certifies an order for interlocutory review, this Court "may . . . in its discretion, permit an appeal to be taken from such order." *Id.* Although this Court is not bound by the criteria set forth in 28 U.S.C. § 1292(b), it still "inform[s]" this Court's "action." 16 Fed. Prac. & Proc. Juris. § 3929; *see Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974) (applying Section 1292(b) criteria).

As the district court correctly noted in its certification order, the Trust did not dispute either of the first two elements. Doc. 229 at 1 n.1. Instead, the Trust focused only on the third element. The reason why is obvious. The Trust could not possibly dispute either the first or second element.

Nevertheless, so that this Court may have a complete understanding of the dispositive issues for appeal, a brief discussion of all three elements follows.

### 1. The certified order involves controlling questions of law.

Initially, the question the district court formulated for this Court's review subsumes a more fundamental controlling question of law—whether the surface or

16

subsurface owner had any duty at all to pay taxes or whether it was the obligation

of the land. In addition, this Court should also address whether the Trust's failure

to challenge the taxing authority's assessment and tax sale within two years of that

sale, in 1908, precludes the Trust from challenging it more than a century later.

As the Supreme Court has emphasized, "appellate jurisdiction applies to the

*order* certified to the court of appeals, and is not tied to the particular question

formulated by the district court." *Yahama Motor Corp. v. Calhoun*, 516 U.S. 199,

205 (1996) (emphasis in original). An "appellate court may address any issue fairly

included within the certified order because it is the *order* that is appealable, and not

the controlling question identified by the district court." *Id.* (emphasis in original)

(citation omitted); *see Barbato v. Greystone Alliance, LLC*, 916 F.3d 260, 264 (3d

Cir. 2019). Therefore, this Court should address these questions "fairly included"

in the certified order.

The rule under Pennsylvania law at the time of the 1908 tax sale was that

separate interests in real estate (surface and subsurface) had to be separately

reported, assessed, and taxed. If they were not, the property was assessed as a

whole. *Herder*, 143 A.3d at 375; *see also Pa. Game Comm'n*, Doc. 219-2 at 9;

*Moore*, 566 A.2d at 908. Proctor never reported his subsurface interest. Rather, the

district court inferred from the fact that CPLC paid taxes assessed against the

Haines Warrant, that it must have reported its surface interest. Doc. 222 at 25. This

inference is one of the district court's errors. That error aside, the property was assessed and taxed as a whole. When CPLC did not pay the taxes in 1907, and the land was sold at a tax sale in 1908, the separate surface and subsurface interests were unified in the tax sale purchaser (McCauley). *See Herder*, 143 A.3d at 368, citing *Sagamore Big Game Club*, 166 F. Supp. at 475; *Moore*, 566 A.2d at 908. In other words, that tax sale purchase effected, not a redemption, but a title wash. Settled Pennsylvania law on this point is clear.

As the Pennsylvania Supreme Court recently reiterated, "the concept of a tax sale reuniting severed estates of unseated property and perfecting previously defective titles" has a "long history." *Herder*, 143 A.3d at 367. The landowners themselves (CPLC and Proctor) had "no legal duty" to pay the taxes because the "'the land itself, and not the owner of it, is debtor for the public charge.'" *Herder*, 143 A.3d at 367, quoting *Strauch v. Shoemaker*, 1 Watts & Serg. 166, 176 (Pa. 1841); *see Pa. Game Comm'n*, Doc. 219-2 at 12-13; *see also Neill v. Lacy*, 1 A. 325 (Pa. 1885) (taxes subsurface owner paid were not recoverable from surface owners; there was "no personal liability" because "unseated land was the debtor;" subsurface owner "should have had his property assessed separately from the surface"). The district court mistakenly determined that CPLC had a duty to pay taxes.

18

The district court then compounded its error by misapplying the rule from *Powell v. Lantzy*. Doc. 222 at 35-39. That rule provides that "one cannot profit by his own wrongdoing and build up or acquire a title founded upon his own neglect of duty." *Powell*, 34 A. at 451. But, as the Pennsylvania Supreme Court also explained in *Powell*, this rule is restricted "to cases where it was the duty of the purchaser to pay the tax." 34 A. at 451. Thus, in *Powell*, the Pennsylvania Supreme Court specifically held that nothing prohibited that surface owner of unseated land from purchasing the entire property at the tax sale because the "[t]he land alone was liable." *Id.*; *see Herder*, 143 A.3d at 367. Here, too, CPLC had no duty to pay; it was the land that was liable.

None of this was inequitable because, within two years of the tax sale, the Trust, as Proctor's successor, could have challenged the assessment of the subject property as a whole. *See Cornwall*, 158 A.3d at 161 (noting that prior owners did not seek to upset tax sale within statutory period); *Keta Gas*, 2019 WL 6652174, *6 (estopping Trust from challenging any alleged irregularity in 1908 tax sale since it was beyond the statutory period). Because the Trust did not, it is barred from challenging the assessment a century later.[5] *See Bannard*, 293 A.2d at 49; *see also*

---

[5] A contrary rule that would allow a tax sale to be upset on such a basis "would result in chaos." *Herder*, 143 A.3d at 373. The two-year redemption period, like a statute of limitations, promotes finality. *See id.* at 366, citing *Strauch*, 1 Watts & Serg. at 176.

*Woodhouse Hunting Corp., Inc. v. Hoyt*, 183 A.3d 453, 458 (Pa. Super. 2018) (challenge to assessment and tax sale after initial two-year redemption period is barred, and "if the land is not redeemed within that period, then both surface and subsurface rights are extinguished"). This bar ultimately renders the question of whether the severance was reported to the county commissioners and should have been separately assessed prior to the 1908 tax sale immaterial as a matter of law. *See Pa. Game Comm'n*, Doc. 219-2, at 15-16.

The questions here are undoubtedly controlling. The district court determined that McCauley's purchase at the tax sale was only a "redemption" of CPLC's surface interest. It was not. His purchase effected a "title wash." Thus, McCauley acquired unified title (surface and subsurface) at the tax sale. Twelve years later, the Commission acquired that same unified title. Given the district court's errors, the certified order would have to be reversed, and judgment would have to be entered in favor of the Commission on title to this "bellwether" property, both surface and subsurface. *See Katz*, 496 F.2d at 755 (controlling question of law encompasses "every order which, if erroneous, would be reversible error on final appeal"); 16 Fed. Prac. & Proc. Juris. § 3930 (3d ed. Oct. 2020 update) ("no doubt that a question is 'controlling' if its incorrect disposition would require reversal of a final judgment"). Again, to the district court's credit, it recognized that whether CPLC had a duty to pay taxes on its unseated surface

20

interest constitutes a controlling question of law, which, again, the Trust did not contest. Doc. 229 at 2.

These controlling questions are also solely ones of law. They do not hinge on the resolution of any purported disputed factual questions. *See Bartnicki v. Vopper*, 200 F.3d 109, 114 (3d Cir. 1999) (interlocutory review of questions of law raised in order denying summary judgment); *see also Ahrenholz v. Board of Trustees of Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000) (a question of law is one "the court of appeals could decide quickly and cleanly without having to study the record"). To the contrary, the dispositive questions of Pennsylvania law decided in the district court's certified order are precisely the types of controlling legal issues where interlocutory review is warranted.

### 2. There is not only substantial ground for difference of opinion on these questions, the district court's determination is contrary to settled Pennsylvania law.

A substantial ground for difference of opinion exists when the issue is "contestable." *Ahrenholz*, 219 F.3d at 675. The substantial ground factor "does not turn on a prior court's having reached a conclusion adverse to that from which appellants seek relief," rather it is enough "where reasonable jurists might disagree on an issue's resolution." *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011). Here, there is more than just disagreement, the district court's

determination on these controlling questions of law is directly contrary to settled Pennsylvania law.

As detailed above, the district court fundamentally erred in concluding that CPLC had a personal duty to pay taxes and that the Trust could challenge assessment of the property as a whole a century after the tax sale. Pennsylvania courts have repeatedly rejected such arguments, including, most recently, the Pennsylvania's 2016 decision in *Herder*. *See Herder*, 143 A.3d at 374-375 (contest to assessment must be within two years of sale; tax on unseated land is the liability of the land); *Cornwall*, 158 A.3d at 160-61 (delineating bases for voiding tax sale); *see also Pa. Game Comm'n*, Doc. 219-2 at 12 (noting that divided property was still sold as a whole if not separately assessed; CPLC had no duty to pay taxes on unseated lands because the land itself was chargeable; absent basis to void tax sale, challenge had to be brought within two years).[6]

As with the first element, the Trust did not contest this substantial ground element. And, based on these same Pennsylvania state-court decisions, the district

---

[6] The Pennsylvania Supreme Court vacated Judge Ellen Ceisler's memorandum opinion because she had impermissibly overturned the ruling of the *en banc* Commonwealth Court finding a disputed issue of fact on whether a severance had been reported to the County Commissioners. 2021 WL 5346728, *2-3. That vacatur, however, does not speak to Judge Ceisler's analysis of the governing law. Thus, in addition to the other Pennsylvania authority discussed, Judge Ceisler's reading of the relevant Pennsylvania law provides a "substantial ground for difference of opinion." 28 U.S.C. 1292(b).

court found this element satisfied. Doc. 222 at 2; *see Katz*, 496 F.2d at 754-55 (noting "remote likelihood" that district court would frivolously certify its own order).[7] This Court, respectfully, should find the same.

### 3. An immediate appeal would materially advance the ultimate termination of the litigation.

This last requirement "is closely tied to the requirement that the order involve a controlling question of law." 16 Fed. Prac. & Proc. Juris. § 3930 (3d ed.). It is satisfied when an appeal would "promise to *speed up* the litigation." *Ahrenholz*, 219 F.3d at 675. For example, this requirement is clearly met if resolution of a controlling legal question will obviate the need for trial. *See Katz*, 496 F.2d at 755; *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004). Unlike the first two elements, the Trust did contest this element; however, the district court rightly recognized that an immediate appeal would materially advance the ultimate termination of the litigation. Doc. 222 at 3.

Both the Magistrate Judge and Judge Connor referred to the dispute over the Haines Warrant as a "bellwether." Doc. 155 (R&R), 222 at 1. As Judge Connor himself recognized, the resolution of the controlling legal questions "'may

---

[7] The fact that the district court first granted summary judgment in favor of the Commission and then reversed course also suggests that the substantial ground element is satisfied. *See Katz*, 496 F.2d at 755 (where it took "two district court opinions to arrive at a decision," substantial ground element was met).

materially advance the ultimate termination of the litigation'" because "this litigation involves dozens of similar tracts that would each be subject to the same controlling legal question involving the preexisting duty to pay taxes on unseated lands." Doc. 229 at 3 (certification order). When settled Pennsylvania law is properly applied, the Commission would have superior title as to the subsurface rights of the Haines Warrant. Such a reversal would not only be dispositive as to that tract, but also to many of the remaining tracts and so eliminate the need for a trial on those tracts.

To sum up, all the criteria of Section 1292(b) are satisfied. Permission to appeal is not limited to an "exceptional case," but, as the district court found, this is such a case. Doc. 229 at 3; *See Katz*, 496 F.2d at 754-56; 16 Fed. Prac. & Proc. Juris. § 3929. Thousands of acres of Commonwealth land sitting above lucrative natural gas and the settled expectations of those landowners whose chain of title includes purchasers at century-old tax sales is at stake. Accordingly, this Court should grant the petition.

# CONCLUSION

For these reasons, the Court should grant the petition.

Respectfully submitted,

JOSH SHAPIRO
Attorney General

By:    /s/ Michael J. Scarinci

MICHAEL J. SCARINCI
Deputy Attorney General
Bar No. 323816 (Pa.)

J. BART DeLONE
Chief Deputy Attorney General
Appellate Litigation Section

Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
Phone: (717) 857-2184
FAX:   (717) 772-4526

DATE: February 4, 2022

## CERTIFICATE OF COUNSEL

I, Michael J. Scarinci, Deputy Attorney General, hereby certify as follows:

1. That I am a member of the bar of this Court.

2. That this Petition contains 5,024 words within the meaning of Fed. R. App. Proc. 32(f) and so complies with Fed. R. App. Proc. 5(c)(1). In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

/s/ Michael J. Scarinci

MICHAEL J. SCARINCI
Deputy Attorney General

## CERTIFICATE OF SERVICE

I, Michael J. Scarinci, Deputy Attorney General, do hereby certify that I have this day served the foregoing Petition For Permission To Appeal by depositing two copies of the same in the United States mail, first class, postage prepaid, on the following:

Laura A. Lange
1670 Sturbridge Drive
Sewickley, PA 15143

Justin G. Weber
Troutman Pepper
Suite 200
100 Market Street
PO Box 1181
Harrisburg, PA 17108-1181
Attorneys for the Thomas E. Proctor Heirs Trust

Four copies were also sent by commercial carrier to the Clerk of the United States Court of Appeals for the Third Circuit in Philadelphia, Pennsylvania.

/s/ Michael J. Scarinci

MICHAEL J. SCARINCI
Deputy Attorney General

DATE: February 4, 2022

27

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION, | : : : : | CIVIL ACTION NO. 1:12-CV-1567 (Judge Conner) |
| Plaintiff | : : | |
| v. | : : | |
| THOMAS E. PROCTOR HEIRS TRUST, | : : : | |
| Defendant | : : | |

## <u>MEMORANDUM</u>

Plaintiff, Commonwealth of Pennsylvania, Pennsylvania Game Commission ("Game Commission"), claims it owns both the surface and subsurface rights for numerous tracts of land in Sullivan and Bradford Counties in northeastern Pennsylvania. Defendant, Thomas E. Proctor Heirs Trust[1] ("Proctor Trust" or "the Trust"), disagrees, contending it holds superior title to the subsurface estates underlying these tracts. A lengthy and complex legal battle has ensued, culminating in a bench trial regarding subsurface ownership of the Josiah Haines warrant—a bellwether tract of land in LeRoy Township, Bradford County. As we explain in further detail herein, the court finds in favor of Proctor Trust.

---

[1] The Margaret O.F. Proctor Trust was also a named defendant in this action until April 13, 2021, when the court granted Proctor Trust's concurred-in motion to dismiss that entity. (<u>See</u> Docs. 212, 213).

# I.   **Procedural History**

The Game Commission initially filed this action in August 2012. Following several rounds of Rule 12 motion practice, the Game Commission eventually filed the operative second amended complaint in December 2014 seeking to quiet title to 2,481 acres in Sullivan and Bradford Counties in northeastern Pennsylvania. The Trust counterclaimed, also seeking to quiet title and adding claims for conversion and unjust enrichment. The Game Commission subsequently filed a counterclaim for tortious interference. This protracted procedural history is outlined in a February 2019 report and recommendation from Magistrate Judge Susan E. Schwab, familiarity with which is presumed. (See Doc. 183 at 2 (citing Doc. 155 at 1-10)).

Following a period of discovery, both parties moved for partial summary judgment, seeking to quiet title to the subsurface estate of a single tract, the bellwether 410-acre Josiah Haines warrant. The court denied summary judgment based on material factual disputes regarding two issues: (1) whether the scope of the 1907 assessment leading to the 1908 tax sale of the Josiah Haines warrant included the subsurface estate, and (2) whether Calvin H. McCauley, Jr.,[2] who purchased the Josiah Haines warrant at the 1908 tax sale, was acting as an agent of the Central Pennsylvania Lumber Company ("CPLC"). The court convened a one-day bench trial in April 2021 to determine ownership of the subsurface estate of the

---

[2] We refer to Calvin H. McCauley, Jr., as "McCauley" throughout this opinion. We note, however, that several items in evidence also refer to his father, Calvin H. McCauley. Where necessary, we use the appropriate suffix to differentiate between father and son.

Josiah Haines warrant. After trial, the parties submitted proposed findings of fact and conclusions of law. We now resolve outstanding evidentiary objections and set forth our findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). See FED. R. CIV. P. 52(a).

## II.    **Outstanding Evidentiary Objections**[3]

During the April 2021 bench trial, the court admitted Joint Exhibits 2 through 29 without objection. (See 4/27/21 Tr. 9:13-20, 10:15-16; Joint Exs. 2-29). Plaintiff's Exhibits 3 through 35 were admitted without objection. (See 4/27/21 Tr. 133:22-135:5). Defense Exhibits 39, 40, and 42 were not admitted. (See id. at 115:18-116:15). In addition to the objections raised in its pretrial brief, the Game Commission reserved an objection to Joint Exhibits 30, 31, and 32 on grounds of relevance, and possibly authenticity and hearsay, depending on their use at trial. (See id. at 9:23-10:14). We consider the remaining evidentiary objections *seriatim.*

---

[3] The court's resolution of evidentiary objections is based on the parties' pretrial exhibit list and briefing as well as argument during the April 2021 bench trial. (See Docs. 204, 206, 214, 218). The factual narrative in Section III represents the court's findings of fact as derived from the record. Citations thereto include the transcript of the bench trial convened on April 27, 2021, ("4/27/21 Tr. [page:line]"), as well as stipulated facts, (Doc. 205 ¶ __), and exhibits introduced by both parties, ("Joint Ex. __," "Pl. Ex. __," and "Def. Ex. __").

## A.    Proctor Trust's Objections

Proctor Trust contends several pages of the parties' first joint exhibit, as well as two of the Game Commission's exhibits, contain inadmissible expert legal conclusions. (See Doc. 206 at 1-3; Joint Ex. 1 at 1-6; Pl. Exs. 1, 2).

Admissibility of expert testimony is governed by Federal Rule of Evidence 702. See FED. R. EVID. 702; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588-89 (1993).  The Third Circuit Court of Appeals has explained that "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003) (citation omitted).  For expert testimony to "fit," it must be "sufficiently tied to the facts of the case, so that it 'fits' the dispute and will assist the trier of fact." UGI Sunbury, LLC v. A Permanent Easement for 1.7575 Acres, 949 F.3d 825, 832 (3d Cir. 2020) (internal quotation marks omitted).

According to Rule 704, an expert's opinion "is not objectionable just because it embraces an ultimate issue." See FED. R. EVID. 704.  But an opinion on the ultimate issue is not admissible if the opinion "would merely tell the [factfinder] what result to reach." See id. advisory committee's notes to 1971 amendment.  Rule 704 must also "be read in conjunction with Rule 702, which requires opinion evidence to be helpful to the jury." See Collie v. Wal-Mart Stores E., L.P., No. 1:16-CV-227, 2017 WL 2264351, at *1 (M.D. Pa. May 24, 2017) (Conner, C.J.).  Our court of appeals further cautions that experts may not "testify as to the governing law of the case." See Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006).  They also may not provide opinions "about the ultimate legal conclusion." Patrick

v. Moorman, 536 F. App'x 255, 258 (3d Cir. 2013) (nonprecedential) (citing

Berckeley, 455 F.3d at 217; United States v. Leo, 941 F.2d 181, 196-97 (3d Cir. 1991)).

Allowing an expert to so testify effectively usurps the court's role. Berckeley, 455

F.3d at 217.

### 1. *Wilkinson Report*

The Game Commission obtained a declaration and title report from J.C.

Wilkinson, III, an attorney with experience in "oil and natural gas title issues in

Pennsylvania." (See Pl. Ex. 1 at 2). Wilkinson provides an expert opinion on the

scope of the 1908 tax sale to McCauley and the ownership of the subsurface estate of

the Josiah Haines warrant. (See id. at 3-7). The Trust continues to object to the

Wilkinson report, arguing it contains "legal opinion testimony." (See Doc. 206 at 1-

4).

In a February 2019 report and recommendation, Magistrate Judge Susan E.

Schwab partially granted Proctor Trust's motion to strike the Wilkinson report and

recommended striking portions of that evidence, reasoning that such testimony is

"not helpful to the court or factfinder." (See Doc. 155 at 11-17 & nn.8-9). In our

April 2020 opinion, we expressed "complete agreement with Judge Schwab's

analysis and conclusions" on the Wilkinson report and adopted them as our own.

(See Doc. 187 at 7 n.5). We continue to agree that the conclusions set forth in the

Wilkinson report regarding the legal effect of the 1908 tax sale and ownership of the

disputed subsurface rights impermissibly usurp our role in this quiet title action.

See Berckeley, 455 F.3d at 217. To reiterate Judge Schwab, we will not consider

Wilkinson's discussion of the "governing law" as it pertains to the Pennsylvania

Supreme Court's opinion in <u>Herder Spring Hunting Club v. Keller,</u> 143 A.3d 358,

364 (Pa. 2016). We also will not consider Wilkinson's legal conclusions (1) that the

Proctor Trusts do not have an interest in the subsurface estate; (2) that the

Commonwealth has title to the subsurface estate; (3) that 100% of both the surface

estate and the subsurface estate is vested in the Commonwealth; (4) that the 1908

tax sale resulted in a "Title Wash" that extinguished the prior reservation of oil, gas,

and mineral rights; and (5) that the 1920 deed from the CPLC to the Commonwealth

does not contain clear language of reservation in favor of CPLC. (<u>See</u> Doc. 155 at

16). We will not strike the other portions of the report. (<u>See id.</u> at 16-17).

## 2.    *Percheron Title Abstract*

The parties submitted a joint exhibit comprised of several hundred pages

that begins with a six-page abstract by Percheron Title. (<u>See</u> Joint Ex. 1 at 1-6).

The other pages consist of, *inter alia*, maps, deeds, and unseated land books. (<u>See</u>

<u>id.</u> at 7-615). The Trust objects to only the first six pages of the exhibit for the same

reason it objects to the Wilkinson report, arguing it contains inadmissible legal

conclusions. (<u>See</u> Doc. 206 at 2-3). We agree with the Trust, as these pages also

contain conclusions about the effect of the 1908 tax sale and whether it effected a

title wash on the subsurface estate—a dispute that is at the heart of this quiet title

action. Percheron Title's rendering of an opinion on this matter usurps the court's

role.  See Berckeley, 455 F.3d at 217.  We will not consider the first six pages of the parties' first joint exhibit.  (See Joint Ex. 1 at 1-6).

### 3.  *Sullivan County Title Report*

The Game Commission submitted an exhibit related to the Commonwealth's purchase of numerous land tracts, including the Josiah Haines warrant, from CPLC.  (See Pl. Ex. 2 at 1).  The Trust summarily contends "substantial portions" of this exhibit are legal conclusions from the Game Commission's title examiner, and the other portions are not relevant to ownership of the Josiah Haines subsurface estate.  (See Doc. 206 at 3 n.2).  The Trust does not, however, provide excerpts or even pagination for the portions it considers "legal conclusions" from this 100-page exhibit.  (See id.)  We "decline to root through the record" and make the Trust's argument for it, see Zimmermann v. NLRB, 749 F. App'x 148, 150 (3d Cir. 2019) (nonprecedential) (citing United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)), and therefore will deny the Trust's objection.  We will consider the exhibit to the extent it contains relevant information about either the 1907 assessment or McCauley's status as an agent of CPLC.

### B.  **Game Commission's Collateral Estoppel Arguments**

The Game Commission contends that Proctor Trust is collaterally estopped from relitigating the issues currently before the undersigned due to two state-level cases involving the Trust as a party, one of which also involves the Game Commission.  (See Doc. 214 at 1-3).  The doctrine of collateral estoppel dictates that "a question or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the

same parties or their privies." Montana v. United States, 440 U.S. 147, 153 (1979). Collateral estoppel specifically bars relitigation of an issue that was conclusively determined in a prior adjudication and that was essential to the original judgment. Witkowski v. Welch, 173 F.3d 192, 198 (3d Cir. 1999); Venuto v. Witco Corp., 117 F.3d 754, 758 (3d Cir. 1997). Collateral estoppel promotes fairness and certainty, while preventing wasteful expenditure of resources on issues already resolved through adversarial proceedings. See Allen v. McCurry, 449 U.S. 90, 94 (1980); Montana, 440 U.S. at 153–54; Witkowski, 173 F.3d at 198-99.

A federal court sitting in diversity in Pennsylvania must apply Pennsylvania law with respect to issue preclusion. See Witkowski, 173 F.3d at 199. Pennsylvania courts apply a four-part test derived from Section 27 of the Restatement (Second) of Judgments to determine whether collateral estoppel bars a potential claim. Witkowski, 173 F.3d at 199 (citing Pa. State Univ. v. County of Centre, 615 A.2d 303, 306 (Pa. 1992)). Relevant here, Pennsylvania courts have explained that when the "judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments," collateral estoppel may not be warranted. See Off. of Disciplinary Couns. v. Kiesewetter, 889 A.2d 47, 52 (Pa. 2005) (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 330 (1979)).

We reject the Game Commission's collateral estoppel arguments related to Keta Gas & Oil Co. v. Proctor, No. 1975 MDA 2018, 2019 WL 6652174 (Pa. Super. Ct. Dec. 6, 2019), as well as Commonwealth v. Thomas E. Proctor Heirs Tr., No. 493 M.D. 2017, 2020 WL 256984 (Pa. Commw. Ct. Jan. 16, 2020). The Keta decision affirmed a trial court's decision on summary judgment where the trial court found

8

no genuine issues of material fact for trial on, *inter alia*, whether certain subsurface reservations had been reported. See <u>Keta</u>, 2019 WL 6652174, at *3. This court, however, already concluded in April 2020 that Proctor Trust has "proffered competent evidence that Union Tanning and CPLC reported their unseated surface interest to Bradford County Commissioners." (See Doc. 183 at 27). We thus do not consider the <u>Keta</u> decision preclusive because, unlike the trial court, we did not and do not consider the Trust's evidence speculative. <u>Cf.</u> <u>Keta</u>, 2019 WL 6652174, at *5. Nor do we consider the 2021 Commonwealth Court opinion preclusive, as the Pennsylvania Supreme Court has vacated that decision and remanded the case for further proceedings. See <u>Pennsylvania Game Comm'n v. Thomas E. Proctor Heirs Tr.</u>, No. 12 MAP 2021, 2021 WL 5346728, at *1 (Pa. Nov. 17, 2021); (<u>see also</u> Doc. 221). These opinions are "inconsistent with" our previous summary judgment opinion providing the applicable law for trial, and preclusive effect is not warranted. <u>See</u> <u>Kieswetter</u>, 889 A.2d at 52.

### C.    Game Commission's Objections

#### 1.    *Relevance Objections*

"Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, and the fact is of consequence in determining the action." Fed. R. Evid. 401. Evidence is relevant unless it has "*no* tendency to prove [a consequential] fact." <u>Spain v. Gallegos</u>, 26 F.3d 439, 452 (3d Cir. 1994) (citation omitted). Relevance is a low bar. <u>See</u> <u>Forrest v. Parry</u>, 930 F.3d 93, 114 (3d Cir. 2019).

9

The Game Commission asserts a general relevance objection to all of the Trust's exhibits, claiming "these misperceived factual disputes are irrelevant and immaterial as a matter of law." (See Doc. 214 at 8). The Game Commission has further lodged objections to nearly all of the 53 exhibits from the Trust on the parties' final joint exhibit list. (See Doc. 204; Doc. 214 at 9-37). We consider these objections in several groupings depending on the substance of the evidence offered, its purpose, the objection, and our ruling. If we do not rule on a particular evidentiary item, we have not considered it in our analysis.

### a.  General Relevance

We overrule the Game Commission's general objection for the reasons stated in our summary judgment opinion, which sets forth the factual disputes to be resolved at trial. As noted in that opinion, disputes regarding the scope of the 1907 assessment of the Josiah Haines warrant, as well as McCauley's status as an agent of CPLC, are both relevant and material to determining the current legal owner of the subsurface estate. (See Doc. 183 at 23-43). The Game Commission's objection is preserved for appellate review. (See 4/27/21 Tr. 26:19-27:2).

### b.  Exhibits Offered in Relation to CPLC's Reporting Practices

The Trust has offered over a dozen exhibits in relation to the issue of whether Union Tanning Company ("Union Tanning") or CPLC properly reported their surface interest in the Josiah Haines warrant pursuant to the Act of 1806, P.L. 644, 4 Sm. L. 346, § 1, repealed and replaced by 72 PA. STAT. AND CONS. STAT. ANN. § 5020-409. (See Def. Exs. 2-9, 44-47, 49-51). The Game Commission argues these

exhibits are irrelevant and immaterial. (See Doc. 214 at 13-37).[4] As explained in our summary judgment opinion, evidence concerning Union Tanning's and CPLC's reporting practices are relevant to the instant dispute. (See Doc. 183 at 29-31). We will summarize each documentary exhibit offered by the Trust, and the Game Commission's objection, in turn.

Exhibits 1, 2, 3, 8, and 47 are excerpts from land assessment books within Bradford County, covering a range of years from 1895 to 1930. (See Def. Exs. 1-3, 8, 47). Exhibits 1 and 8 provide records from Leroy Township; Exhibit 2 from Barclay Township; and Exhibit 3 from Overton Township. (See Def. Ex. 1-3). Exhibit 47 contains records from each of these townships. (See Def. Ex. 47). Exhibit 50 is a recapitulation statement from the county commissioners to the Barclay Township assessors in 1894, instructing assessors to return a list of, *inter alia*, "all property taxable by law." (See Def. Ex. 50 at 2). The Game Commission objects to Exhibits 2 and 3 because the Josiah Haines warrant is not located within those townships, to Exhibit 8 because it concerns seated land, to Exhibit 47 because it contains information after the tax sale occurred in 1908, and to Exhibit 50 because it does not explain the 1908 tax sale. (See Doc. 214 at 13, 16, 32, 34).

We will overrule the objection to these exhibits. When land was still assessed as seated and unseated in Pennsylvania, county land assessors were responsible for

---

[4] Although the Game Commission initially objected to Exhibit 51 from the Trust, (see Doc. 214 at 34), it withdrew this objection during trial, (see 4/27/21 Tr. 118:16-19). Exhibit 51 is a demonstrative exhibit which contains magnifications of certain pages from the parties' joint exhibits. (See Def. Ex. 51). We will admit this exhibit to the extent it aids in reading these notations.

"travers[ing] the county" to determine whether land was seated or unseated and for reporting such distinctions to the county commissioners for taxation purposes. Herder Spring Hunting Club v. Keller, 143 A.3d 358, 364 (Pa. 2016); see McCall v. Lorimer, 4 Watts 351, 353 (Pa. 1835). The Trust has offered these exhibits to demonstrate reporting practices and payment at the county level. (See 4/27/21 Tr. 30:14-32:11). We consider reporting practices within Bradford County, of both seated and unseated lands, and the recapitulation statements used to assess property, to be relevant to our resolution of this matter. We also do not consider Exhibit 47 outside the relevant time period because we consider tax-payment activity occurring on the Josiah Haines warrant in 1909 and 1910 to be relevant to our analysis. (See also Doc. 183 at 28, 32-34).

We do not, however, consider Exhibits 4, 5, 6, 7, 9, or 49 relevant to the instant dispute. (See Def. Exs. 4-7, 9, 49). Exhibit 4 is a Pennsylvania Supreme Court paper book from a state court case in 1907 involving CPLC. (See Def. Ex. 4 at 1, 2). The testimony to which the Trust refers relates to Lycoming County rather than Bradford County and does not reference the Josiah Haines warrant. (See id. at 49-59). So too for Exhibits 5 and 6, which are letters from Proctor's estate to the Lycoming County treasurers, and the assessment books for McIntyre Township in Lycoming County, respectively. (See Def. Exs. 5-6). Nor do we consider Exhibit 7, which depicts the Commonwealth's gas and oil development in 2007, to be relevant to our analysis. (See Def. Ex. 7). We also will not consider Exhibit 9, which is comprised of several news articles from the 1890s and early 1900s regarding planned or ongoing coal operations during that time period, on tracts of land

12

formerly owned by Proctor and Hill. (See Def. Ex. 9 at 1, 7, 10). The Trust has not proffered competent evidence that any coal mining occurred on the Josiah Haines warrant during the relevant period. Finally, Exhibit 49 is a map of the "Schrader Lands." (See Def. Ex. 49 at 1). The parties do not dispute that Schrader Mining & Manufacturing owned the Josiah Haines warrant prior to Proctor and Hill, and we do not consider this map relevant to our analysis. (See Doc. 205 ¶¶ 3, 4).

Exhibits 44, 45, and 46 are sworn declarations from three individuals who are custodians of different recordkeeping entities in the Commonwealth. Exhibit 44 is from the Bradford County Historical Society; Exhibit 45 is from the office of the Recorder and Register of Deeds for Bradford County; and Exhibit 46 is from the Pennsylvania State Archives. (See Def. Ex. 44 ¶¶ 3, 4; Def. Ex. 45 ¶¶ 3, 5; Def. Ex. 46 ¶¶ 3, 5). Each exhibit attests to the same fact, *viz.*—that the entity "does not possess any notices to the Bradford County Board of Commissioners" from the 1890s through the 1920s. (See Def. Ex. 44 ¶ 5; Def. Ex. 45 ¶ 6; Def. Ex. 46 ¶ 6). The Game Commission objects that these declarations are irrelevant. We disagree. As noted in our summary judgment opinion, legal ownership of the Josiah Haines subsurface estate depends partially on whether certain interests were reported to the county commissioners in Bradford County. (See Doc. 183 at 29-31). This information is relevant to whether such records still exist or were retained by the entities that originally received them over a century ago.

### c.  **Exhibits Offered in Relation to McCauley**

The Trust has offered over 30 exhibits in relation to McCauley and whether he was acting as an agent for CPLC when he purchased the Josiah Haines warrant at a tax sale in June 1908. The Game Commission argues these exhibits are irrelevant and immaterial. (See Doc. 214 at 13-37). As noted above, we consider McCauley's relationship to CPLC to be highly relevant and material to resolving this quiet title dispute. (See Doc. 183 at 23-43).

Exhibits 10, 11, 21, 23, 25, and 26 are documents from two court cases that originated in the Potter County Court of Common Pleas. (See Def. Exs. 10, 11, 21, 23, 25, 26). Exhibits 12, 13, and 14 are CPLC's corporate documentation from its inception in 1903. (See Def. Exs. 12, 13, 14). Exhibits 15, 16, and 17 are letters to McCauley in 1904 and 1905. (See Def. Exs. 15, 16, 17). Exhibits 18, 19, 20, and 22 are *Boyd's Directory* excerpts from 1906 through 1909 that contain listings for CPLC and for McCauley. (See Def. Exs. 18, 19, 20, 22). Exhibit 24 is a page from the United States Census in 1910 listing McCauley as a "lawyer" for a "lumber co." (See Def. Ex. 24). Exhibits 27 and 28 are copies of a notarized declaration by McCauley in 1914, stating that he was acting in trust for CPLC and using CPLC funds when he purchased six properties in Elk County from the county treasurer, and that his name on the deeds "is used only in trust for" CPLC. (See Def. Exs. 27, 28). Exhibit 29 consists of several deeds whereby McCauley quitclaims dozens of parcels of land (consisting of thousands of acres) to CPLC for $1.00. (See Def. Ex. 29). Exhibits 30 and 31 are letters from 1916 on CPLC "Legal Department" letterhead from McCauley. (See Def. Exs. 30, 31). Exhibit 32 contains two

newspaper articles that mention McCauley's positions within CPLC in 1913 and 1917. (See Def. Ex. 32). Exhibit 48 consists of two news articles from *The Williamsport Sun* in 1907 and 1908. (See Def. Ex. 48). One refers to "Calvin H. McCauley," who in 1908 was admitted to the Lycoming County bar and appointed "assistant general solicitor" for CPLC. (See id. at 1, 2).[5] The other names a "Calvin H. McCauley, Jr., of the Central Pennsylvania Lumber company," as a visitor to Ridgway, Pennsylvania in 1907. (See id. at 3, 4).

The Game Commission objects to all these documents on the basis of relevance, arguing that they are not probative of McCauley's status as CPLC's agent.[6] We overrule these objections, noting that an agency relationship does not require direct evidence "if it can be reasonably inferred from the circumstances of the case." Scott v. Purcell, 415 A.2d 56, 61 n.8 (Pa. 1980) (citing Yezbak v. Croce, 88

---

[5] The Game Commission argues it would be improper to consider this article to pertain to McCauley, Jr., when the suffix "Jr." is not included and he had a father of the same name who also held a leadership position in CPLC. (See Doc. 214 at 37; 4/27/21 Tr. 131:22-133:5). However, the Trust proffered other evidence indicating McCauley, Sr., only ever held the position of "general solicitor" within the company. (See Def. Ex. 53; 4/27/21 Tr. 136:24-137:21). We agree with the Trust on this point. It would be fanciful to infer that McCauley, Sr., who was appointed general solicitor when CPLC was formed in 1903, (see Def. Ex. 53 at 1, 2), and was further mentioned as its general solicitor in December 1907, (see id. at 3, 5), was demoted to *assistant* general solicitor less than two months later in February 1908, (see Def. Ex. 48 at 1, 2). We find that defense Exhibit 48 refers to McCauley, Jr., and not his father. We will also overrule the Game Commission's relevance objections to defense Exhibit 53. (See Doc. 214 at 36-37). This exhibit contains articles regarding McCauley, Sr. that rebut the inference the Game Commission would have us draw from the lack of a suffix in defense Exhibit 48.

[6] The Game Commission also considers Exhibits 10 and 11 irrelevant because, *inter alia*, they "do not mention McCauley, Jr." (See Doc. 214 at 18-19). This statement is incorrect—he is listed as an attorney of record for CPLC during the appeal. (See Def. Ex. 11 at 2).

A.2d 80, 82 (Pa. 1952)). Each of these documents demonstrates McCauley's association with CPLC in the years surrounding the tax sale in 1908 and are circumstantial evidence of his agency status. We thus consider this evidence relevant to McCauley's relationship with CPLC.

We will sustain, however, the Game Commission's objections to some of the evidence adduced by the Trust on relevancy grounds. Exhibit 33 is a collection of letters between Proctor's heirs and McCauley as well as others, and Exhibit 34 is a map referenced in some of the correspondence. (See Def. Exs. 33, 34). Exhibit 35 consists of more correspondence referring to coal leases between 1913 and 1921. (See Def. Ex. 35). McCauley is mentioned but is neither an author nor recipient of any letter in this exhibit. (See id. at 11). Most of the letters in Exhibit 33 are handwritten and illegible, as are several in Exhibit 35. (See Def. Ex. 33 at 1-16, 18-22, 30; Def. Ex. 35 at 1-6, 16). The remaining letters, while typed and therefore legible, reference mineral rights in tracts other than the Josiah Haines warrant. (See e.g., Def. Ex. 33 at 24).

At trial, counsel for the Trust noted that the John Barron tract, referenced in Exhibit 33, was also subject to the 1908 tax sale, and argued this material is relevant to highlight the ongoing communications between McCauley and the Proctor heirs following the tax sale, as well as evidence that Proctor's heirs had active coal leases following CPLC's deed to the Game Commission. (See 4/27/21 Tr. 63:11-67:3). We make no determination whether this information is relevant to *other* tracts, but the Trust does not direct us to any letter where the Josiah Haines warrant is mentioned. Furthermore, the maps in Exhibit 34 indicate that the area in which

coal was mined did not cover the Josiah Haines warrant. (See Def. Ex. 34 at 9). We will not consider Exhibits 33 through 35 as they are not relevant to our resolution of the instant dispute regarding the bellwether tract.

We will also not consider Exhibits 36, 37, 38, or 43 to the extent they contain legal opinions about the effect of the 1908 tax sale. Two of these exhibits are 1931 letters from the Game Commission's title examiner John E. Potter, one is a response to Potter from A.F. Jones of CPLC, and one is a title examination excerpt regarding certain tracts of land in Lycoming County. (See Def. Exs. 36, 37, 38, 43). The letters contain Potter's beliefs about the effect of a tax sale on tracts of land. (See Def. Ex. 36 at 3-4; Def. Ex. 37 at 11-12; Def. Ex. 38 at 2). The title examination excerpt is likewise the examiner's belief about a purchase McCauley made. (See Def. Ex. 43 at 8). These opinions are not relevant to our determination of McCauley's agency status.

### 2. *Authenticity Objections*

All admissible evidence must be authenticated. FED. R. EVID. 901(a). Similar to relevance, the standard for authentication is "slight." United States v. Turner, 718 F.3d 226, 232 (3d Cir. 2013) (citation omitted). An evidentiary item is authenticated by "evidence sufficient to support a finding that the item is what the proponent claims it is." Id. at 232 (quoting FED. R. EVID. 901(a)). Once the proponent makes a *prima facie* showing of authenticity, the evidence goes to the factfinder. Id. (citation omitted). The proponent can use circumstantial evidence, including the context in which the evidence was obtained and its contents, to authenticate evidence. Id. at 232-33.

17

For ancient documents, Rule 901 provides an exemplar method for authentication if the proponent can adduce evidence that the ancient document "is in a condition that creates no suspicion about its authenticity; was in a place where, if authentic, it would likely be; and is at least 20 years old when offered." See FED. R. EVID. 901(b)(8). In deciding authenticity, the court may also consider the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item." FED R. EVID. 901(b)(4).

The Game Commission objects to the authenticity of a series of defense exhibits comprised of CPLC's ledger books and letters interwoven within the books that concern McCauley. (See Doc. 214 at 10-13). These ledger books and the letters within them are in the possession of nonparty Lauri Sekerak, who testified about her acquisition of the items. (See Joint Ex. 30). Sekerak, who worked as an abstractor in Pennsylvania, testified that she came into possession of the ledger books around 2005. (See Joint Ex. 30, Sekerak Dep. 7:12-8:5, 11:5-8). When Sekerak learned that a Warren County law firm was dissolving, she offered to take the ledger books from the firm's library after learning they would otherwise be thrown away. (See id. at 8:6-10:19). Proctor Trust proffered additional evidence in pretrial briefing to explain why the ledger books were located in a law firm Warren County, noting CPLC's headquarters moved to Sheffield, in Warren County, until it closed in 1941. (See Docs. 206-1, 206-2).

The Proctor Trust produced the original CPLC ledger books during the April 2021 bench trial for examination, and the court inspected the books containing the letters at issue. (See 4/27/21 Tr. 82:3-83:25). The ledger books are organized by map

18

number into seven volumes. (See Sekerak Dep. 7:22-8:8:5). They contain maps for CPLC tracts and corresponding ledger information for the tracts from the early twentieth century. (See id. at 13:21-14:21). Relevant here, many tract pages contain letters that have been affixed on or between a particular tract's map and its ledger entries. (See id. at 17:5-18:17). Some of these letters, offered by the Trust into evidence, are dated between 1904 and 1916 and are either written by, or addressed to, "Calvin H. McCauley, Jr." (See Def. Exs. 15, 16, 17, 30, 31). Each letter had been affixed onto certain pages of the ledger books. (See Sekerak Dep. 17:5-18 (Def. Ex. 15), 20:1-10 (Def. Ex. 16), 23:16-25 (Def. Ex. 17), 27:8-18 (Def. Ex. 30), 30:23-31:16 (Def. Ex. 31)). One additional exhibit is an entry from the ledger book regarding the Josiah Haines warrant. (See Def. Ex. 41). The court confirmed during trial that this exhibit was also contained within the CPLC ledger books submitted for examination. (See 4/27/21 Tr. 115:18-22).

During her deposition, Sekerak testified that each of the letter exhibits were located in the ledger books on the same page as lots or tracts mentioned in the letter. Exhibit 15 is a 1904 letter to McCauley regarding a Lot 146 in Hamilton Township and was affixed in the CPLC ledger book on the page for Tract 146 in Hamilton Township, and the ledger page references the letter itself. (See Sekerak Dep. 18:13-19:1). Exhibit 16 is a 1905 letter to McCauley regarding the Alexander McMullen warrant and was affixed to the ledger's plat page for the Alexander McMullen warrant. (See id. at 21:8-25). Exhibit 17 is a 1905 letter to McCauley on CPLC letterhead regarding "warrant #5105" and is affixed to the ledger page on "tract 5105" in Forest County. (See id. at 25:12-25). Exhibit 30 is a 1916 letter from

19

McCauley regarding a Lot 578 in Warren County and is affixed on a ledger page regarding a "tract of land 578" in Warren County. (See id. at 28:25-29:6). Finally, Exhibit 31 is a 1916 letter from McCauley regarding "Warrant 4737" in Ulysses Township and is affixed on a ledger page regarding "tract 4737" in Ulysses Township. (See id. at 32:13-17).

Based on Sekerak's deposition testimony, as well as the court's careful examination of the ledger books and the letters contained therein, we will overrule the Game Commission's authenticity objection. Both the ledger books and the letters within them contain "distinctive characteristics" that support the Trust's claim that they are, in fact, CPLC ledgers as well as letters to and from McCauley during his tenure with CPLC. See FED. R. EVID. 901(b)(4). The letters were also located in a place where, if authentic, such documents would be.[7] Each letter was carefully affixed and preserved within CPLC ledger books, and the ledger books were located in the same county in Pennsylvania that CPLC was headquartered until its closure. (See Docs. 206-1, 206-2). Finally, the ledger books and letters are over a century old. The court's inspection of the ledger books and letters within them created no suspicion about their age or the circumstances in which they were located. In sum, we find that the Trust has provided *prima facie* evidence to

---

[7] The Game Commission observes that the letters were "glued into" the ledger books and argues they should be considered with suspicion. (See Doc. 214 at 15). We disagree. Neither the ledger books nor the letters were in a condition that creates suspicion about their authenticity. Sekerak attested that each letter references a tract of land and is affixed to the ledger page matching that same tract. (See Sekerak Dep. 15:14-32:25).

authenticate Exhibits 15, 16, 17, 30, 31, and 41, and we will not exclude them on authenticity grounds.

### 3. *Hearsay Objections*

Hearsay is a "statement other than one made by a declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). Hearsay is inadmissible unless an exception enumerated in the Federal Rules of Evidence applies. Agere Sys., Inc. v. Advanced Env't Tech. Corp., 602 F.3d 204, 232 (3d Cir. 2010).

The Game Commission objects to several exhibits as hearsay because they are letters, newspaper articles, or other writings. (See Doc. 214 at 9-10). The Game Commission alludes to "double hearsay" in its briefing, but provides no further argument as to what statements within these documents it considers further hearsay, and we again decline to make the Game Commission's argument for it. See Zimmermann, 749 F. App'x at 150 (citation omitted). The Trust responds that (1) all of the challenged exhibits qualify as ancient documents and are therefore excepted from the hearsay rule, and (2) the exhibits further qualify under other hearsay exceptions. (See Doc. 206 at 8-9).

We agree with the Trust. Exhibits 15, 16, 17, 30, 31, and 41 are the authenticated CPLC ledger book pages and letters affixed to them. They are ancient documents and are excepted from the hearsay rule. See FED. R. EVID. 803(16); Langbord v. U.S. Dep't of Treasury, 832 F.3d 170, 190 (3d Cir. 2016).

The Game Commission's remaining hearsay objections similarly fail. Exhibit 12 is the First Annual Report of CPLC from 1903; it is also excepted as an ancient

document. See FED. R. EVID. 803(16). Exhibits 18, 19, 20, and 22 are excerpts from

*Boyd's Directory* in 1906 through 1909. (See Def. Ex. 18-20, 22). These exhibits

qualify as ancient documents, and also qualify as "directories" because they are

"compilations that are generally relied on by the public." See FED. R. EVID. 803(16),

803(17); see also United States v. Woods, 321 F.3d 361, 364 (3d Cir. 2003) (explaining

rationale behind "directories" exception). Exhibit 27 is a notarized declaration of

trust from 1914 signed by McCauley. (See Def. Ex. 27). This document is self-

authenticating as an acknowledged document, see FED. R. EVID. 902(8), and further

qualifies as an ancient document, see FED. R. EVID. 803(17). Exhibits 32, 48, and 53

are various news articles from the early twentieth century. (See Def. Ex. 32, 48, 53).

These documents are self-authenticating as newspapers or periodicals, see FED. R.

EVID. 902(6), and qualify as ancient documents, see FED. R. EVID. 803(17). We will

not exclude these exhibits on the grounds of hearsay.

### III.   **Findings of Fact**

#### A.   **CPLC Reported Its Surface Estate in the Josiah Haines Warrant Prior to 1907**

The Commonwealth of Pennsylvania warranted a tract of land to Josiah

Haines in 1793.[8] (See Doc. 205 ¶ 1). The land encompassing the Josiah Haines

warrant is located in what is now LeRoy Township, Bradford County. (See id. ¶¶ 1,

3). In 1893, then-owner Schrader Mining & Manufacturing Company conveyed the

Josiah Haines warrant, along with other tracts, to Thomas E. Proctor and Jonathan

---

[8] See Herder Spring, 143 A.3d at 360 n.3 (describing the warrant process by
which land was conveyed in Pennsylvania).

A. Hill. (See id. ¶¶ 4, 5; Joint Ex. 3). The next year, Proctor and Hill and their wives conveyed the surface estate of the Josiah Haines warrant, along with other tracts, to Union Tanning. (See Doc. 205 ¶ 6; Joint Ex. 4). The 1894 deed to Union Tanning expressly "reserved" the subsurface rights to minerals, oil, gas, coal, and petroleum (hereinafter "mineral rights" or "subsurface estate") to the tracts contained in the deed.[9] (See Joint Ex. 4 at 13; Doc. 205 ¶¶ 6, 7; Doc. 220 ¶ 13). In the 1894 deed, Proctor and Hill also retained the land of several warrants less those warrants' "bark rights." (See Joint Ex. 4 at 2; Doc. 220 ¶ 14). The warrants retained by Proctor and Hill in the 1894 deed were the Henry Beck, John Graff, Thomas Dundas, and James Biddle warrants. (See Doc. 220 ¶ 14). Proctor died the same year and the defendant, Proctor Trust, is his successor in interest to the Josiah Haines warrant. (See Doc. 205 ¶¶ 8-10).

LeRoy Township assessment records from 1896 through 1903 reflect Union Tanning's ownership in the Josiah Haines warrant. (See Def. Ex. 1). In 1896, the Josiah Haines warrant is assessed to "U.T. Co." (See id. at 3). In 1898, the Josiah Haines warrant is included under "unseated lands ass[']ed to the Union Tanning Company." (See id. at 7). LeRoy Township assessment records from this period also reflect the lands retained by Proctor in the 1894 deed. (See Def. Ex. 1 at 8).

---

[9] As noted in our summary judgment opinion, it is more accurate to say Proctor and Hill "excepted" the mineral rights from their conveyance to Union Tanning, rather than that they "reserved" them. (See Doc. 183 at 3 n.3 (citing Lauderbach-Zerby Co. v. Lewis, 129 A. 83, 84 (Pa. 1925))).

Namely, the Beck, Graff, Dundas, and Biddle warrants continued to be assessed for taxes to Proctor and Hill. (See id. at 8, 10, 11, 12, 13).

In 1903, Union Tanning conveyed its surface ownership interest in the Josiah Haines warrant to CPLC, excepting the rights to certain tree bark and conveying the property "subject to" all prior exceptions and reservations. (See Doc. 205 ¶¶ 11-12; Joint Ex. 5). From 1894 through 1902, Union Tanning paid taxes on the Josiah Haines warrant, which was assessed as unseated in LeRoy Township. (See Joint Ex. 8 at 10, 14; Joint Ex. 9 at 2, 6, 10, 14, 18; Joint Ex. 10 at 2, 5). From 1903 through 1906, CPLC paid taxes on the same warrant. (See Joint Ex. 10 at 8, 11, 14; Joint Ex. 11 at 2; see also Joint Ex. 11 at 1 ("C P L Co means Central Pennsylvania Lumber Co.")). Taxes assessed against the Josiah Haines warrant for 1907 were not paid. (See Doc. 205 ¶ 13; Joint Ex. 12 at 3).[10]

As the LeRoy Township assessment records attest, tax officials were aware of Union Tanning's surface interest created by the 1894 deed. Starting in 1894, tax assessments on the Josiah Haines warrant were levied against, and paid by, Union Tanning. (See Def. Ex. 1 at 7). Meanwhile, the county commissioners continued to assess taxes on the lands that had been "retained" in the 1894 deed against Proctor

---

[10] For tax years 1895 and 1896, the Bradford County unseated land assessment books inadvertently referred to the 410-acre Josiah Haines warrant as the "Joseph Haines" warrant. (See Joint Ex. 8 at 14; Joint Ex. 9 at 2). That error was corrected in 1897, (see Joint Ex. 9 at 6), and the entries remained accurate through 1901, (see id. at 10, 14, 18; Joint Ex. 10 at 2). Beginning in 1902 and continuing through 1906, the tract is again mislabeled as the "Joseph Haines" or "Joseph Hines" warrant in the unseated assessment books. (See Joint Ex. 10 at 5, 8, 11, 14; Joint Ex. 11 at 2). For tax years 1907 and 1908, the name is once more corrected to "Josiah Haines." (See Joint Ex. 11 at 5, 9).

and Hill. (See Def. Ex. 1 at 8, 10, 11, 12, 13). After Union Tanning conveyed its surface interest in the Josiah Haines warrant to CPLC in 1903, CPLC was then assessed, and paid, taxes on the warrant from 1903 to 1906. (See Joint Ex. 10 at 8, 11, 14; Joint Ex. 11 at 2). The evidence of record therefore demonstrates that both Union Tanning and CPLC reported their surface ownership interests in the Josiah Haines warrant to county commissioners. (See Doc. 220 ¶ 33).

**B.      Calvin H. McCauley, Jr., Had a Long-Time Association with CPLC**

On June 8, 1908, the Josiah Haines warrant was sold to Calvin H. McCauley, Jr., to recover the unpaid 1907 taxes. (See Doc. 205 ¶¶ 15-16; Joint Ex. 11 at 5). In December 1910, McCauley and his wife quitclaimed all interest in numerous properties, including the Josiah Haines warrant, to CPLC for $1.00. (See Doc. 205 ¶ 16). In 1920, CPLC conveyed its interest in the warrant, along with other properties, to the Game Commission. (Id. ¶¶ 17-18).

At CPLC's formation in 1903, corporate documentation listed McCauley as the company's treasurer. (See Def. Ex. 13 at 2; Def. Ex. 14 at 1). CPLC's first annual report lists McCauley as its real estate agent. (See Def. Ex. 12 at 3). In 1904 and 1905 correspondence contained in CPLC's ledger books, McCauley is addressed as "R.E. Agt., C.P.L. Company." (See Def. Ex. 15 at 1; Def. Ex. 16 at 1). Internal correspondence from CPLC's "Land and Timber" superintendent dated December 1905 is addressed to McCauley as a "real estate agent" and is stamped with a date of receipt by "Central Penna Lum. Co. Real Estate Dept." (See Def. Ex. 17 at 1). The CPLC ledger book, which contains the company's bark-peeling records on the Josiah Haines warrant as well as its own internal record of "land sales," makes no

mention of McCauley's purported ownership of the tract; instead, it only lists the 1920 sale to the Commonwealth. (See Def. Ex. 41 at 1). Finally, an excerpt from the Game Commission's title abstract contains a schedule of taxes for the Josiah Haines warrant. (See Pl. Ex. 2 at 40-42). Its listing for 1907 associates McCauley with CPLC, listing both McCauley and CPLC as the warrant's "owner" in 1907 and in 1908, two and three years before McCauley quitclaimed the property back to CPLC. (See id. at 42).

Several public documents confirm McCauley's association with CPLC as well. For example, *Boyd's Directory* entries from 1906 through 1909 list McCauley as a real estate agent, assistant general solicitor, or attorney at the same address as CPLC. (See Def. Exs. 18, 19, 20, 22). The change in McCauley's title from attorney to assistant general solicitor in the 1908 *Boyd's* listing is supported by the February 1908 news article noting his appointment as "assistant general solicitor for the Central Pennsylvania Lumber Company." (See Def. Ex. 48 at 1). McCauley also appeared as an attorney for CPLC, and as a notary public for CPLC's president, in several state court proceedings from 1908 through 1910. (See Def. Ex. 11 at 2; Def. Ex. 21 at 7; Def. Ex. 23 at 2; Def. Ex. 25 at 1; Def. Ex. 26 at 1, 6). The 1910 United States census lists McCauley's occupation as "lawyer" for a "lumber co." (See Def. Ex. 24 at 1).

Other actions by McCauley demonstrate his affiliation with CPLC. From 1904 to 1916, McCauley purchased at tax sales more than 100 properties that were previously owned by CPLC and later quitclaimed those tracts back to CPLC, all in consideration for $1.00. (See Def. Ex. 29 at 1, 4, 12). The same 1910 sale at which

McCauley quitclaimed the Josiah Haines warrant included 44 additional tracts. (See id. at 8-11). In 1914, McCauley executed a notarized declaration stating he was acting in trust for CPLC when he purchased six properties in Elk County from the county treasurer using funds provided by CPLC. (See Def. Ex. 27 at 2).

After he quitclaimed the Josiah Haines warrant (and other tracts) to CPLC in 1910, McCauley continued to be associated with CPLC for several years. For example, news articles in 1913 and 1917 note McCauley was elected to CPLC's Board of Directors. (See Def. Ex. 32 at 2, 6). The CPLC ledger books also contain correspondence on McCauley's personalized CPLC letterhead to an engineer in 1916. (See Def. Ex. 30, 31). We do not hesitate to find that McCauley had a long and well-documented employment with CPLC.

## IV.  **Conclusions of Law**

The plaintiff in a quiet title action must recover on the strength of its own title, not the weakness of the defendant's title. See Herder Spring, 143 A.3d at 372 (citing Albert v. Lehigh Coal & Navigation Co., 246 A.2d 840, 843 (Pa. 1968)). The plaintiff has the burden to prove title by a preponderance of the evidence. See Montgomery County v. MERSCORP Inc., 795 F.3d 372, 374 n.2 (3d Cir. 2015) (citing Moore v. Dep't of Env't Res., 566 A.2d 905, 907 (Pa. Commw. Ct. 1989)).

### A.  **CPLC Complied with the Act of 1806**

Under Pennsylvania law, "there may be three separate estates in land: the surface, the right of support, and the subsurface mineral rights." United States v. 3,218.9 Acres of Land, More or Less, Situated in Warren Cnty., 619 F.2d 288, 291 (3d Cir. 1980) (citing Pa. Bank & Tr. Co. v. Dickey, 335 A.2d 483, 485 (Pa. Super. Ct.

27

1975); <u>Smith v. Glen Alden Coal Co.</u>, 32 A.2d 227, 234 (Pa. 1943)). Thus, a single tract of land can be "severed and owned by different persons." <u>3,218.9 Acres of Land</u>, 619 F.2d at 291. Prior to 1947, Pennsylvania's real property taxing practices varied depending on whether land was noticeably occupied or developed ("seated") or wild and undeveloped ("unseated"). <u>Herder Spring</u>, 143 A.3d at 363-64. Although unseated land was considered "wild," it could still be "severed into surface and subsurface estates." <u>Id.</u> at 364 (citation omitted).

Pennsylvania distinguished between seated and unseated land for tax-collection purposes. <u>See id.</u> at 363. County land assessors determined whether land was seated or unseated and then reported that determination to the county commissioners for appropriate taxation. <u>Id.</u> at 364; <u>see</u> <u>McCall</u>, 4 Watts at 353. Owners of land designated as seated could be held personally liable for the taxes assessed on their plot. <u>Herder Spring</u>, 143 A.3d at 364. If land was deemed unseated, taxes were "imposed on the land itself," and owners were not held personally liable if they failed to pay the taxes owed. <u>Id.</u>; <u>Northumberland County v. Phila. & Reading Coal & Iron Co.</u>, 131 F.2d 562, 565-66 (3d Cir. 1942).

In the early 1800s, many unseated landowners failed to pay the taxes due on their land. <u>See</u> <u>Herder Spring</u>, 143 A.3d at 354. Instead of trying to impose personal liability for unpaid taxes on these unseated lands, Pennsylvania enacted statutes whereby the unseated land could simply be sold to pay the delinquent taxes. <u>Id.</u> at 365. We review the Act of 1804 and the Act of 1806 as relevant to the case at bar.

The Act of 1804 constitutes the origin of tax-sale "title-washing." See id. at 366. According to Section 5:

> [S]ales of unseated land, for taxes that are now due ...
> shall be in law and equity valid and effectual, to all intents
> and purposes, to vest in the purchaser or purchasers of
> lands sold as aforesaid, all the estate and interest therein,
> that the real owner or owners thereof had at the time of
> such sale, although the land may not have been taxed or
> sold in the name of the real owner.

Id. at 366 (quoting Act of 1804, April 3, P.L. 517, 4 Sm. L. 201, § 5). This allowed a tax sale to "extinguish[] all previous titles" to the land that was assessed and sold for delinquent taxes. See id. at 366 (quoting Reinboth v. Zerbe Run Improvement Co., 29 Pa. 139, 145 (Pa. 1858)). When unseated land was severed into surface and subsurface estates, those separate estates "could be separately assessed, taxed, and, if necessary, sold at tax sale." Id. at 364 (citing F. H. Rockwell & Co. v. Warren County, 77 A. 665, 666 (Pa. 1910)).

The Act of 1806 imposed a reporting requirement in connection with unseated land, stating "it shall be the duty of every holder of unseated lands" to provide the county commissioners with a signed statement describing the tract of land and "the name of the person or persons to whom the original title from the commonwealth passed, and the nature, number, and date of such original title." Id. at 368 (quoting Act of March 28, 1806 ("Act of 1806"), P.L. 644, 4 Sm. L. 346, § 1, repealed and replaced by 72 PA. STAT. AND CONS. STAT. ANN. § 5020-409). For those transfers occurring after the law's passage, a person "becoming a holder of unseated land" was required to "furnish a like statement, together with the date of the conveyance to such holder, and the name of the grantor, with in one year." See

id. Failure to comply with this reporting requirement resulted in a penalty equal to "four times the amount of tax" owed on the land. See id. at 368. The Act of 1806 obligated then-current unseated landowners to provide the commissioners with information about their property. See id. The Act of 1806 also required subsequent owners of unseated land to provide information about newly acquired property interests. See id. To state the obvious, the statutory purpose was "to allow the commissioners to impose an appropriate tax." Id. at 369. Owners were also responsible for reporting a severance of the original warrant or a division due to such severance, because "assessors would treat unseated lands 'entirely in reference to the original warrants, when not otherwise directed by the owners.'" Id. at 370 (quoting Hutchinson v. Kline, 49 A. 312 (Pa. 1901) (per curiam)). In other words, unseated land, while severable, was "assessed and taxed as a whole" unless owners informed the commissioners differently. Id. If the owners did report a severance, assessors could then separately assess and tax the subsurface estate if it had value. See id. at 368.

We have already found as a matter of fact that CPLC reported its interest in the surface estate of the Josiah Haines warrant. We conclude as a matter of law that CPLC complied with the Act of 1806 by "inform[ing] the commissioners of the land owned to allow the commissioners to impose an appropriate tax." See Herder Spring, 143 A.3d at 369. According to the statute, one who is "becoming a holder of unseated land" must report his interest. Herder Spring, 143 A.3d at 368 (citation omitted). In Herder Spring, the record contained "no evidence" that the previous surface or subsurface owner reported their respective unseated interest to county

commissioners following severance of the warrant at issue. See id. at 360. Under such circumstances, the court concluded, the warrant must have been assessed as a whole (and sold as a whole) because county officials had never been directed otherwise. Id. at 360, 372, 375. In stark contrast, the tax assessment records in this matter are competent evidence establishing CPLC's compliance with the Act of 1806. Cf. Herder Spring, 143 A.3d at 360. Thus, CPLC's compliance with the reporting requirements of the Act of 1806 meant that the commissioners of Bradford County were "otherwise directed" to assess the surface and subsurface estates of the Josiah Haines warrant separately. See Herder Spring, 143 A.3d at 370 (quoting Hutchinson, 49 A. 312). This critical deviation from the facts of Herder Spring forecloses the argument that the 1908 tax sale at issue must have included the whole warrant.

The Game Commission contends that there is "no evidence establishing that the severance was ever reported to Bradford County Commissioners." (See Doc. 219 ¶ 20). As we stated in our summary judgment opinion, this argument is merely semantics; reporting a surface estate for separate taxation and reporting a "severance" is a distinction without a difference. (See Doc. 183 at 30). The assessment books make clear that Union Tanning and CPLC were assessed taxes on the Josiah Haines warrant and paid those taxes. The Game Commission still offers no alternative explanation as to how Union Tanning and CPLC were named in the unseated assessment books and paid assessed taxes if those entities had not reported their ownership interests to Bradford County officials. The Trust has provided declarations from various records custodians confirming that the initial

correspondence that served as notice to the County Commissioners cannot be located in various archives. (See Def. Exs. 44, 45, 46).

The assessment books and the notations contained within them are likely the only remaining public records of any notification to county commissioners. (See 4/27/21 Tr. 50:10-51:20). Although the Game Commission underscores the absence of tax levies on the Josiah Haines subsurface estate during Union Tanning's and CPLC's ownership of the surface estate, this fact has very limited evidentiary value. In Herder Spring, the state supreme court observed that subsurface estates were not taxed unless they were determined to have distinct and cognizable tax value; if they "had no value," they were not subject to levy. See Herder Spring, 143 A.3d at 368. Furthermore, the Trust correctly points out that the assessment books contain no indication that either Union Tanning or CPLC was ever assessed a four-fold penalty for failing to report. (See Doc. 220 ¶ 33); Herder Spring, 143 A.3d at 368. Finally, we have received no evidence that Union Tanning or CPLC improperly reported owning *more* than the surface estate. We conclude that Union Tanning and CPLC properly reported their interest in the surface estate of the Josiah Haines warrant, thus complying with the Act of 1806.

To be clear, however, we do not find as a matter of law that only the surface estate was assessed in 1907 or offered for sale by the treasurer in 1908. The record is unclear on the parameters of the 1907 assessment and the 1908 sale. It is conceivable that the Proctor heirs also defaulted, or the treasurer erroneously offered the entire warrant at the 1908 tax sale. Our conclusion on this issue merely serves to reinforce the distinction between the facts of this case and those in Herder

32

Spring. Nevertheless, as noted in our summary judgment opinion: "Even if we could definitively conclude that the county treasurer properly offered the entire Josiah Haines warrant at the 1908 tax sale, what was *offered* for sale is not dispositive as to what interest this tax sale effectively conveyed." (See Doc. 183 at 31). As we conclude below, CPLC's compliance with the Act of 1806, combined with McCauley's status as an agent of CPLC, as well as CPLC's breach of its duty to pay 1907 taxes on the Josiah Haines warrant, rendered McCauley's 1908 purchase a mere redemption.

## B. McCauley Acted as CPLC's Agent During the 1908 Tax Sale

The existence of a principal-agent relationship is a question for the factfinder. See Walton v. Johnson, 66 A.3d 782, 787 (Pa. Super. Ct. 2013) (citing Volunteer Fire Co. of New Buffalo v. Hilltop Oil Co., 602 A.2d 1348, 1351 (Pa. Super. Ct. 1992)). Such a relationship "results from the consent of one [] that another may act on his behalf." Lincoln Ave. Indus. Park v. Norley, 677 A.2d 1219, 1222 (Pa. Super. Ct. 1996) (citing Smalich v. Westfall, 269 A.2d 476, 480 (Pa. 1970)). The agency relationship "requires no special formalities." McIlwain v. Saber Healthcare Grp., Inc., 208 A.3d 478, 485 (Pa. Super. Ct. 2019). Nor must it be in writing. See Falconer v. Mazess, 168 A.2d 558, 560 (Pa. 1961). An agency relationship's existence need not be proven by direct evidence "if it can be reasonably inferred from the circumstances of the case." See Scott v. Purcell, 415 A.2d 56, 61 n.8 (Pa. 1980) (citing Yezbak v. Croce, 88 A.2d 80, 82 (Pa. 1952)).

We find that McCauley acted as an agent of CPLC in the 1908 tax sale of the Josiah Haines warrant. See Lincoln Ave., 677 A.2d at 1222 (citing Smalich, 269 A.2d

33

at 480). The evidence offered by the Trust allows us to "reasonably infer" an agency relationship from the unique circumstances of this case, where the individuals with personal knowledge of an agency relationship agency are no longer living. See Scott, 415 A.2d at 61 n.8 (citation omitted).

Principally, we emphasize an undisputed fact: after McCauley purchased the Josiah Haines warrant at a June 1908 tax sale, CPLC—*not McCauley*—paid taxes on the Josiah Haines warrant in 1908 and 1909. (See Joint Ex. 11 at 9; Def. Ex. 47 at 2). Other record evidence originating with CPLC confirms this conclusion, including CPLC's corporate documentation naming McCauley in its leadership, CPLC's ledger books that conspicuously lack any record of the purported sale to McCauley, and CPLC internal correspondence to and from McCauley while he worked for the company. (See Def. Exs. 12-17, 30-32, 41). We further note that public documents, including *Boyd's Directory* excerpts, court filings, newspaper articles, and McCauley's own notarized declaration reinforce our conclusion. (See Def. Exs. 11, 18-23, 25-27, 48). In much the same way McCauley declared he was acting "in trust for" CPLC when he made tax purchases in Elk County, we conclude he was acting on behalf of CPLC when purchasing the Josiah Haines warrant in Bradford County. (See Def. Ex. 27 at 2).

### C. Because CPLC Breached Its Duty to Pay 1907 Taxes, McCauley's Purchased as CPLC's Agent Effected Only a Redemption

It is uncontested that in 1907, CPLC did not pay the assessed taxes on the Josiah Haines warrant, thereby causing the property to be sold by the Bradford County treasurer at the 1908 tax sale. (See Doc. 205 ¶¶ 13, 15). Default occurred in

1907, the very same year that CPLC records indicate the company completed its bark-peeling activities on the tract. (See Def. Ex. 41 at 1). In June 1908, McCauley purchased the Josiah Haines warrant for $49.36, an amount equal to the delinquent taxes for 1907. (See Doc. 205 ¶ 16; Joint Ex. 2 at 72).

We held in our summary judgment opinion that CPLC had a duty to pay taxes on its surface interest in the unseated Josiah Haines warrant in 1907. (See Doc. 183 at 31-43). We restate the bulk of our previous legal analysis herein, as it undergirds our current findings.

Pennsylvania law instructs that "one cannot, by a purchase at a tax sale caused by his failure to pay taxes which he owed the state, or which he was otherwise legally or morally bound to pay, acquire a better title, or a title adverse to that of other parties in interest[.]" Powell v. Lantzy, 34 A. 450, 451 (Pa. 1896) (citing Chambers v. Wilson, 2 Watts 495 (Pa. 1834); Coxe v. Wolcott, 27 Pa. 154 (1856)). This rule "rests upon the principle that one cannot profit by his own wrong, and build up or acquire a title founded upon his own neglect of duty." Id. Instead, such a purchase "operates as a payment only," i.e., a redemption. Id. (citation omitted). Application of this rule is limited to cases where the purchaser had some preexisting duty—arising by law, contract, or equity—to pay the taxes. Id.

There is no case precedent which considers whether, under the foregoing facts, an agent who purchases at a tax sale induced by his principal's default takes good title to the entire property or simply redeems his principal's prior interest. For example, in Powell, the unpaid taxes that induced the treasurer's sale arose prior to the ownership of, and through no fault of, the tax-sale purchaser who

35

currently owned the surface estate. See Powell, 34 A. at 451, 452. Neither the surface nor the subsurface owner had a legal duty to pay the overdue taxes, which had accrued on the land prior to severance during ownership by a different individual. Id. In Hutchinson, taxes on unseated lands went unpaid in 1890 and 1891, before any involvement or ownership by the eventual 1892 tax-sale purchaser. Hutchinson, 49 A. at 317. In Sagamore, delinquent taxes from 1892 induced the 1894 tax sale that divested Proctor of the interest he purchased in 1893. Sagamore, 166 F. Supp. at 468-69, 476. And in Herder Spring, a *bona fide* third party bought the entire warrant from the county, which the county had acquired in fee simple at a tax sale after the prior surface and subsurface owners failed to report their separate interests or pay taxes thereon. Herder Spring, 143 A.3d at 360-61.

Reinboth also presents materially different circumstances. There, the 1840 tax-sale purchaser, Christopher Geiger, held claim to the subject property based on prior conveyances, but there were other putative owners who claimed title to portions of that land. Reinboth, 29 Pa. at 140, 144-45. The property went through two tax sales, one in 1824 and another in 1840. Id. at 144-45. The 1824 tax-sale buyer was an unrelated third party who purchased in good faith, and in 1829, Geiger directed his attorney to purchase the property from the third-party buyer. Id. Geiger's attorney then sought a treasurer's deed for the tract at the 1840 tax sale to eliminate any doubts as to superiority of Geiger's title. See id. at 142, 145. Reinboth is clearly distinguishable because the first tax-sale purchaser was an independent third party.

A final case requiring consideration is <u>Gibson</u>, the decision quoted by <u>Powell</u> for the proposition that "there [i]s nothing in reason or law to prevent the holder of a defective title from purchasing a better one at a tax sale." <u>Powell</u>, 34 A. at 451 (quoting <u>Gibson</u>, 27 Pa. at 160, 165). In <u>Gibson</u>, William A. Williams bought the subject property at a tax sale in 1850 for unpaid 1848 and 1849 taxes. <u>Gibson</u>, 27 Pa. at 160. Williams made the tax-sale purchase at the direction of Eli Felt, who had privately purchased the same land in August 1848 and conveyed it to the defendants early the following year. <u>Id.</u> at 162. Felt directed the tax-sale purchase to "confirm and strengthen" his own title, which he had already transferred to new buyers. <u>Id.</u> The Pennsylvania Supreme Court held Felt was not prohibited from perfecting, at a treasurer's sale, his 1848 title, which he may have deemed "suspicious" and "defective" due to possible fraud by its grantor. <u>Id.</u> at 165. But again, <u>Gibson</u> is materially different because the unpaid taxes at least partially accrued when Felt was not the owner, and because the tax-sale purchase was intended to cure any title defects caused by potential fraud of a prior owner.

Finding no case on point, we revert to the original question raised by <u>Powell</u>: whether CPLC owed any duty to pay the 1907 taxes such that McCauley's purchase—since he was an agent of CPLC—acted merely as a redemption. This issue is purely a matter of state law, and we believe it has ramifications for other pending and future real property disputes in the Commonwealth. In the absence of controlling precedent, it is our task to predict how Pennsylvania courts would rule if confronted with this issue. After careful consideration, we conclude that CPLC owed a legal duty to pay taxes on its unseated surface estate; hence, CPLC could

not use an agent to "acquire a better title, or a title adverse to that of other parties in interest," at a tax sale prompted by its own default. Powell, 34 A. at 451.

It is beyond peradventure that unseated landowners faced no *personal liability* for failing to pay taxes assessed on unseated land. Pennsylvania's highest court has repeatedly affirmed this legal principle for nearly 200 years. As early as 1822, the Pennsylvania Supreme Court acknowledged that "taxes on unseated lands[] have never . . . been considered a charge on the person of the owner." Burd v. Ramsay, 9 Serg. & Rawle 109, 114 (Pa. 1822). In 1841, the court explained that "the land itself, and not the owner of it, is debtor for the public charge," and is looked to for any overdue payment. Strauch v. Shoemaker, 1 Watts & Serg. 166, 175 (Pa. 1841) (quoting Fager v. Campbell, 5 Watts 287, 288 (Pa. 1836)). Fifty-five years later, the Powell court reiterated that when taxes were assessed on unseated land, "there was no personal responsibility on the owner therefor. The land alone was liable." Powell, 34 A. at 451 (citing Hunter v. Cochran, 3 Pa. 105 (1846) (*per curiam*); Russel v. Werntz, 24 Pa. 337 (1855); Logan v. Washington County, 29 Pa. 373 (1857)). In 1972, the Bannard court explained that, as to unseated land, "it is immaterial that the name of the owner as given in the assessment is inaccurate, since no personal liability is involved; the land, not the owner, is looked to for payment of delinquent taxes." Bannard, 293 A.2d at 49. Herder Spring recently reaffirmed this premise, stating that "tax on unseated land was the liability of the land rather than the owners." Herder Spring, 143 A.3d at 375 (citations omitted).

Personal liability, however, is quite different than a duty to pay taxes. Personal liability is a potential *consequence* for breaching a duty, such as failing to

pay taxes on seated land. See id. at 364 (citation omitted). Simply because the Commonwealth imposed no personal liability or "personal responsibility" (as it was sometimes referred to) on unseated landowners for failure to pay assessed taxes does not mean that those owners had no duty to pay taxes in the first place.

To the contrary, courts in the Commonwealth have long recognized an unseated landowner's duty to pay taxes. In Herder Spring, the Pennsylvania Supreme Court reaffirmed that, while the tax-sale regime for unseated land may have appeared "harsh and severe" for landowners, "[a] vigilant owner has nothing to fear. All he has to do is to pay his taxes, and *this he is bound to do upon every principle of equality and justice.*" Herder Spring, 143 A.3d at 366 (emphasis added) (quoting Strauch, 1 Watts & Serg. at 176). The Herder Spring court likewise quoted M'Coy v. Michew, 7 Watts & Serg. 386 (Pa. 1844), for similar reasoning: "If there be hardship, it is one which can easily be avoided by performing the *duty* which the law imposes upon [the owner], to return the land and *pay his taxes.*" Id. at 369 (emphasis added) (alteration in original) (quoting M'Coy, 7 Watts & Serg. at 391). And in Breisch v. Coxe, another case involving taxation of unseated land, the court explicitly stated that "*the payment of taxes is a duty*, and a failure to perform it is the fault of the *owner.*" Breisch v. Coxe, 81 Pa. 336, 346 (1876) (emphasis added); see also Mayor of Phila. v. Riddle, 25 Pa. 259, 263 (1855) (noting that "it is an owner's duty to pay taxes" and failure to do so results in tax sale of owner's land).

The legal duty of owners to pay taxes on unseated land, which was firmly established in the common law, was subsequently codified by statute. In 1887, Pennsylvania's General Assembly passed the Act of June 6, 1887, which mandates:

> That after June first, [1888], *all taxes levied upon unseated lands*, within the counties of this Commonwealth, *shall be paid by the owner or owners of such unseated lands* within the year for which the same are levied; and in case of the refusal or failure of any person or persons, companies or bodies corporate, owner or owners of such unseated lands to pay the taxes so levied within the year for which the same are levied and collectible, then interest at the rate of six per centum, per annum, is to be charged upon the amount of said taxes, or any part thereof, remaining due and unpaid from and after the first day of the year following that for which said taxes were levied until the same has been paid in full, *or the land sold as now provided by law for the sale of unseated lands*: Provided, No interest shall be charged upon taxes levied for the years [1886] and [1887].

Act of June 6, 1887, P.L. 363, No. 248, § 1 (codified at 72 PA. STAT. AND CONS. STAT. ANN. § 5781) (emphasis added). The plain language of this statute unambiguously obligates unseated landowners to pay assessed taxes within a year of levy. Id.

We acknowledge that, at several points in the Herder Spring decision, the court uses language—albeit in *dicta*—which could be read to infer that there was no duty to pay taxes on unseated land. Nevertheless, when put in proper context, we do not believe that such remarks were meant to contradict longstanding legislation or state supreme court precedent.

For instance, the Herder Spring court states that "[t]he owner of unseated land . . . was not personally responsible for the payment of taxes, which were instead imposed on the land itself, in the name of the person to whom the original

40

warrant had been issued." Herder Spring, 143 A.3d at 364. However, this statement is followed by multiple citations to state supreme court decisions indicating that there was no personal *liability* for taxes on unseated land. See id. (citing Strauch, 1 Watts & Serg. at 175; Bannard, 293 A.2d at 49). As noted by a prominent treatise on tax titles, the idea of taxes being "imposed on" or "against" the land, or that the land alone was liable for taxes, "means no more than that taxes assessed upon a specific parcel of real estate can only be collected by a process having for its object the condemnation and sale of the land." HENRY CAMPBELL BLACK, A TREATISE ON THE LAW OF TAX TITLES: THEIR CREATION, INCIDENTS, EVIDENCE, AND LEGAL CRITERIA § 167 (2d ed. 1893). Later in the opinion, the Herder Spring court notes that the Powell decision "explained the duty, or lack thereof, of landowners to pay taxes[.]" Herder Spring, 143 A.3d at 367. Although this language appears broad at first blush, it relates directly to the facts of Powell, where neither the surface nor the subsurface owner had any obligation to pay overdue taxes that had accrued on the property when owned in whole by a different individual. Id. (quoting Powell, 34 A. at 451).

In sum, we read this *dicta* within its context and find that it does not represent a reversal of precedent or an abrogation of the Act of 1887.[11] Had the Herder Spring court intended such drastic outcomes, it would have made its

---

[11] This is especially true when, in the same opinion, the court explicitly states that unseated landowners were bound to pay their taxes "upon every principle of equality and justice," id. at 366 (quoting Strauch, 1 Watts & Serg. at 176), and could avoid the loss of their land at tax sales by performing the "duty" imposed by the law on unseated landowners: "to return the land and pay the taxes," id. at 369 (quoting McCoy, 7 Watts & Serg. at 391).

holdings clear and explicit. Instead, these statements simply affirm the noncontroversial axiom that there was no personal liability on unseated landowners who failed to pay taxes.

We find unpersuasive the Game Commission's arguments against the existence of a legal duty to pay taxes on unseated land, as reiterated in its bench trial memorandum. (See Doc. 219 at 17-25). The Game Commission argues that we have misinterpreted the Powell case. (See id. at 17-21). It bears repeating that, in Powell, the surface owner bought the entire property at a tax sale induced by default of a *prior owner* who had failed to pay taxes assessed on the tract as a whole. Powell, 34 A. at 451, 452. And in Herder Spring, the buyer was a *bona fide* third party who purchased the entire warrant because none of the prior surface or subsurface owners had reported their separate interest to county commissioners or paid the taxes owed, thus causing a tax sale of the entire property. Herder Spring, 143 A.3d at 360-61. Neither tax-sale buyer was under *any* obligation to pay the overdue taxes that caused the treasurer's sales in those cases, so the Powell rule did not apply. The Game Commission's repeated reliance on the outcome in Powell and Herder Spring, therefore, is misplaced because the facts of the case at bar are entirely different.

Furthermore, the fact that CPLC had no duty to pay taxes on the subsurface estate it did not own does not render the Powell rule irrelevant. In Powell, the tax-sale purchaser had no other option to protect his surface interest except to buy the entire property at the tax sale. See Powell, 34 A. at 452 ("Lantzy was in a position in which he was obliged to pay a claim which he did not personally owe, and which

was, in part, a charge upon the land of another, from whom he could not require repayment, or to buy or lose his title."). That is simply not the situation here. All CPLC had to do to protect its surface interest was pay its taxes. If Bradford County incorrectly assessed the entire warrant in 1907, rather than separate estates, CPLC could have challenged that assessment prior to the tax sale or following the sale during the statutory redemption period. See Herder Spring, 143 A.3d at 366. What CPLC could not do is utilize its own default to gain a better title at a tax sale, *i.e.*, "build up or acquire a title founded upon [its] own neglect of duty." Powell, 34 A. at 451. We therefore conclude, as we did in our summary judgment opinion, that CPLC as an unseated landowner had a legal duty to pay taxes assessed on its land.

In the matter *sub judice*, CPLC was the undisputed surface owner of the Josiah Haines warrant prior to the 1908 tax sale. (See Doc. 205 ¶ 11). Thus, CPLC had an affirmative duty to pay taxes assessed on its interest in the surface estate, and breached its duty by failing to pay those taxes in 1907. (See id. ¶ 13). We reiterate that CPLC could not use an agent to "acquire a better title, or a title adverse to that of other parties in interest," at a tax sale prompted by its own default. See Powell, 34 A. at 451. McCauley was acting as CPLC's agent at the 1908 tax sale, and therefore the rule set forth in Powell applies here. CPLC's purchase through McCauley effectuated nothing more than a redemption of its surface interest. See id. A redemption operates to "set aside or annul" the tax sale, leaving the title "precisely as though the sale had not been made." Yocum v. Zahner, 29 A. 778, 779 (Pa. 1894). Since McCauley's purchase acted as a redemption, it left the title as it stood before the sale was made. See id. at 779. Thus, Proctor's subsurface

43

interest in the Josiah Haines warrant was not extinguished at the tax sale, and the
Proctor Trust continues to hold its interest in the subsurface estate.

## V.  Conclusion

We find in favor of Proctor Trust on the issue of ownership of the subsurface
estate of the Josiah Haines warrant.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:  December 3, 2021

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION, | : : : : | CIVIL ACTION NO. 1:12-CV-1567 (Judge Conner) |
| Plaintiff | : : | |
| v. | : : | |
| THOMAS E. PROCTOR HEIRS TRUST, | : : : | |
| Defendant | : : | |

## ORDER

AND NOW, this 3rd day of December, 2021, after convening a bench trial in this matter, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1.   Judgment is ENTERED in favor of defendant Thomas E. Proctor Heirs Trust on the issue of subsurface ownership in the bellwether Josiah Haines warrant only.

2.   The court will schedule, by separate order, a telephone conference with counsel to address remaining matters in the above litigation.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA GAME COMMISSION,** | : | **CIVIL ACTION NO. 1:12-CV-1567** |
| | : | |
| | : | **(Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THOMAS E. PROCTOR HEIRS TRUST,** | : | |
| | : | |
| **Defendant** | : | |

## ORDER

AND NOW, this 28th day of January, 2022, upon consideration of the motion (Doc. 225) for certification of interlocutory appeal by plaintiff the Commonwealth of Pennsylvania, Pennsylvania Game Commission ("Game Commission"), wherein the Game Commission requests immediate appellate review of the court's December 3, 2021 order and to stay proceedings during said appeal, (see id. at 1), and the parties' respective briefs in support of and opposition to said motion, and the court noting that interlocutory appeal is appropriate when the movant establishes that the relevant issue involves a "controlling question of law" over which there is "substantial ground for difference of opinion" and appeal of which "may materially advance the ultimate termination of the litigation,"[1] see 28 U.S.C. § 1292(b), and that

---

[1] The Trust does not dispute that the court's December 3, 2021 opinion and order contains a controlling question of law over which there is substantial ground for difference of opinion, and argues only that "the Game Commission cannot establish that certification will materially advance the ultimate termination of the litigation." (See Doc. 227 at 3-7).

the court should exercise its discretion to certify an interlocutory appeal only in

"exceptional cases," see Caterpillar Inc. v. Lewis, 519 U.S. 61, 74 (1996) (internal

quotation marks omitted); Vicky M. v. Ne. Educ. Intermediate Unit, No.

3:06-cv-1898, 2009 WL 4044711, at *4 (M.D. Pa. Nov. 20, 2009) (citing Link v.

Mercedes-Benz of N. Am., 550 F.2d 860, 863 (3d Cir. 1997)), and the court further

noting that there may be "substantial ground[s] for difference of opinion" when

there is no controlling precedent—or there is conflicting precedent—regarding the

relevant question of law, see In re Chocolate, 607 F. Supp. 2d at 705-06 (citations

omitted); Juice Entm't, LLC v. Live Nation Entm't, Inc., 353 F. Supp. 3d 309, 313

(D.N.J. 2018) (citation omitted), and that interlocutory appeal may be appropriate

when the issue is novel or highly complex, see In re Frascella Enters., No. 08-100,

2008 WL 4155676, at *3 (E.D. Pa. Sept. 10, 2008) (citation omitted), and the court

observing that in the matter sub judice, our December 3, 2021 order (Doc. 223) rests

in part upon the legal conclusion that the Central Pennsylvania Lumber Company

("CPLC") had a preexisting duty to pay taxes on its unseated surface estate, and

therefore could not use an agent (here, Calvin H. McCauley, Jr.) to acquire better

title to that land at a tax sale prompted by CPLC's default on such taxes, (see Doc.

222 at 34-44); that the court's conclusion on this issue constitutes a "controlling

question of law," see 28 U.S.C. § 1292(b); and that the Game Commission cites to

Pennsylvania state-court decisions that provide "substantial ground for difference

of opinion," see 28 U.S.C. § 1292(b); (see also Doc. 226 at 5-8; Doc. 228 at 2-5), and

the court further observing that we have ruled on the ownership of a single tract,

the bellwether Josiah Haines warrant, in our December 3, 2021 opinion and order,

2

but this litigation involves dozens of similar tracts that would each be subject to the same controlling legal question involving the preexisting duty to pay taxes on unseated lands, (see Docs. 89, 227-1), and therefore that resolution of this question "may materially advance the ultimate termination of the litigation," see 28 U.S.C. § 1292(b), and the court finding that the instant quiet title dispute qualifies as an "exceptional case," due to the scope of the court's December ruling, the number of other tracts that it would apply to, and resources that will be conserved if we refrain from taking this this case to conclusion before receiving an appellate court ruling on this common, threshold question, see Caterpillar Inc., 519 U.S. at 74, and the court thus concluding that interlocutory appeal is warranted in this matter, it is hereby ORDERED that:

1. The Game Commission's motion (Doc. 225) to certify an interlocutory appeal is GRANTED. Part IV.C of the memorandum and order of court (Docs. 222, 223) dated December 3, 2021 is CERTIFIED for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

2. The following question is further CERTIFIED pursuant to 28 U.S.C. § 1292(b):

    Under Pennsylvania law in effect at all times relevant to the instant quiet title dispute, did the owner of an unseated surface estate have a legal duty to pay taxes assessed on said surface estate, thereby preventing the owner—or the owner's agent—from acquiring better title to the land at a tax sale induced by the unseated surface owner's default?

3. Proceedings in this matter are STAYED pending appeal.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania